58 CCPA

**TANROSS SUPPLY CO., Inc., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5380.**

United States Court of Customs and Patent Appeals.

Dec. 3, 1970.

**RICH, Judge.**

This appeal is from the judgment of the United States Customs Court, Second Division, C.D. 3870, insofar as it overruled two protests by appellant to the classification of merchandise described as "#1000 Educational Kits" and "#1553 Microscope Dissecting Kits" as "sets" under Item 651.75 of the Tariff Schedules of the United States (TSUS). We affirm the judgment as to the #1000 kits and reverse as to the #1553 kits. Although the classifications were both under the same TSUS item, they present different questions and will therefore be discussed separately.

### I. # 1000 Educational Kits

The #1000 Educational Kits contain laboratory beakers, test tubes, chemicals, a plastic-handled knife, a needle probe, a dissecting board, an instruction book, and other items used in connection with preparation of specimens for viewing under a microscope, but do not contain a microscope. They were classified under TSUS Item 651.75, which reads:

Sets (except sets specially provided for) which include two or more of the tools, knives, forks, spoons, or other articles provided for in different rate provisions of this subpart ........ The rate of duty applicable to that article in the set subject to the highest rate of duty.

The articles which the Collector found brought the kits under this item were the plastic-handled knife and the needle probe, and the entire kits were dutied at the rate of duty applicable to the plastic-handled knife individually.[1]

Cassel & Benjamin, Miami, Fla., attorneys of record, for appellant; Julian R. Benjamin, Miami, Fla., of counsel.

William D. Ruckelshaus, Asst. Atty. Gen., Andrew P. Vance, New York City, Chief, Customs Section, Ralph A. Bontempo, James Caffentzis, for the United States.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and McMANUS, Judge, Northern District of Iowa, sitting by designation.

[1]. Note that in this case the rate of duty at which the set was dutied was that applicable to one of the articles which brought it under the item in question.

There are two questions in this portion of the appeal. First, are the entire kits "sets" within the meaning of TSUS Item 651.75, as the Government contends, or are the plastic-handled knife and the needle probe, considered by themselves, such "sets," as Tanross contends?[2] Second, should imported goods be classified as "sets" under this item when the unit in which the goods are imported and sold, both at wholesale and at retail, contains two or more of the "articles provided for in different rate provisions of * * * [the subpart in which Item 651.75 is found]," but also contains many other articles not provided for in that subpart?[3] The Government contends that if there are at least two such articles in a "set," no matter how many other objects there are in the "set," the entire unit imported falls under Item 651.75. Tanross seems to be contending—although its position is not entirely clear—that such a "set" is dutiable under Item 651.75 only if substantially the entire "set" consists of "articles provided for in different rate provisions of * * [the subpart in which Item 651.75 is found]," that any object in the "set" *not* provided for in that subpart must be very closely related to the articles in the "set" so provided for (apparently, more closely related than simply being in the same set with them), and that there are no such objects in the kits with the plastic-handled knife and the needle probe.[4] We shall discuss these two questions separately.

## A. *The Meaning of the Word "Sets"*

■ The first question in this portion of the appeal was not explicitly considered by the court below in the sense of specifically focusing on the word "sets," but it is implicit in its opinion that it held the entire #1000 Educational Kits to be "sets" within the meaning of TSUS Item 651.75. In so holding, it was undoubtedly influenced, as we are, by the untenability of Tanross's position that the knife and the needle probe together constitute a "set" in the statutory sense, apparently solely because they were imported together and both of them are among the "articles provided for in different rate provisions of * * * [the subpart in which Item 651.75 is found]." With this position we cannot agree. These two articles, although they are set off conceptually by being the only objects in the #1000 Educational Kits which are "provided for in a different

2. The effect of Tanross's contention, if accepted, would be that the other articles making up the kits would each be dutied separately.

3. In this case, forty-two of the total of forty-four' articles making up the kits were not among the articles "provided for in different rate provisions of * * * [the subpart in which Item 651.75 is found]." Tanross, to emphasize the nature of its plight, introduced into evidence an itemization of the contents of the #1000 Educational Kits, a "representative value" for each component, the TSUS item under which duty would be levied on each component if duty were levied on each separately, and the rate at which duty would be levied on each component if the duty were levied separately on each. It is apparent from the face of this itemization, the accuracy of which the Government conceded at trial as far as the individual classifications are concerned, that, if each component were classified separately, every one other than the plastic-handled knife would be du-

tiable at a significantly lower rate than it is as a constituent element in these sets, and, indeed, that there would be *no* duty at all on twelve of the forty-four components. Additionally, it may easily be calculated from the itemization that the two articles which have brought the kits under TSUS Item 651.75 together total only 2.1% of the total value of the kits.

4. Neither in its brief nor in its oral argument has Tanross distinguished what we perceive to be the two separate questions on this branch of its appeal, and it may be that Tanross meant to argue that a unit of merchandise containing a plurality of articles is not a "set" within the meaning of TSUS Item 651.75 unless every article is, in some not very clear sense, closely related to every other article in the unit. If this was the rule for which Tanross intended to argue, then we think that its contention is adequately met by our discussion of the word "sets," infra.

rate provision of * * * [the subpart in which Item 651.75 is found]," are just two components of the forty-four making up each kit. They are in no way segregated or set off within each kit as a distinct subunit thereof. To classify these two components of the kits as together constituting a "set" within the meaning of TSUS Item 651.75 would be directly contrary to the common meaning of the word, which at the least implies some kind of relationship among the constituent parts beyond that of having been imported together.

As the court below noted, "Item 651.75 of the Tariff Schedules of the United States with which we are here concerned projects a new concept in the assessment of import duties." The word "sets" as used therein certainly is not, as Tanross would have us hold, simply a synonym for "entireties," [5] but it is not easy to say just what Congress did mean when it used the word. There is very little legislative history to guide us in interpreting this new provision, but what there is [6] in no way suggests that the word "set" should be given, in this context, any meaning other than its usual meaning of "A number of things of the same kind ordinarily used together; a

collection of articles which naturally complement each other, and usually go together; an assortment; a suit; as, a *set* of chairs, of china, of books, of teeth, etc." Webster's New International Dictionary (2d ed. 1956). Since the #1000 Educational Kits are "a collection of articles which naturally complement each other, and usually go together," all being items used in connection with the preparation of specimens for viewing under a microscope and not being simply an aggregation of disparate articles imported together for shipping convenience, we agree with the court below that they are "sets" within the meaning of TSUS Item 651.75.

## B. *The Meaning of the Words "Which Include"*

The second question in this portion of the appeal was expressly decided by the court below, and we are in general agreement with its disposition of the question. Basically it relied on the nonrestrictive nature of the words "which include," [7] and we agree that their use brings under TSUS Item 651.75 any "set" containing two or more of the "articles provided for in different rate provisions of * * * [the subpart including Item

---

5. However, we note that the opinion below summarily dismisses "several cases [cited by Tanross] involving the question of what constitutes an entirety for tariff purposes" simply because they "arose under prior statutory provisions and are inapposite to a determination of the present issue." While we agree that the cases cited by Tanross are not useful in resolving the case at bar, we point out that we have come to this conclusion, not because the statutory provisions under which they arose were part of prior, now-repealed law, but because they did not purport to interpret the statutory language now before us. Although the doctrine of entireties is not applicable here, it is still very much alive, despite the passage of the new tariff schedules, as a judicially created rule of classification applicable to cases not involving such clearly supervening congressional intent. See, for instance, New York Merchandise Co. v. United States, 62 Cust.Ct. 283, 288, C.D. 3746 (1969).

6. Which may be found at page 200 of the United States Tariff Commission's Tariff Classification Study, "Explanatory and Background Materials" to Schedule 6, Metals and Metal Products (November 15, 1960).

7. The lower court contrasted these words with the word "comprising" used in a roughly corresponding provision of the Brussels Nomenclature. While we agree that "Clearly * * * ['which include'] is not restrictive terminology," we would not give quite so much weight to the supposed difference in meaning between the words "which include" and the word "comprising," since the latter can also introduce an open rather than a closed set. See, for example, Webster's New International Dictionary (2d ed. 1956), which defines "comprise" as meaning either "To comprehend or include" or "To consist or be made up of."

651.75]" regardless of how many objects not so provided for may be in the "set." [8] There is no requirement in TSUS Item 651.75 that a "set" not be classified thereunder unless it is made up "substantially entirely," or even "predominantly" of "articles provided for in different rate provisions of * * * [the subpart in which Item 651.75 is found]," and we are not disposed to read such a requirement into it.

### C. Tanross's Policy Arguments

We might add that we have considered appellant's plea that "the tariff duty rates are established on a commodity basis in connection with international trade" and that "the Congress of the United States could not have intended to upset the trade reciprocity with other nations so that Customs would have a more convenient time in handling its business," but that we are not impressed thereby. Essentially the argument is that the congressional decision was so unwise that we should strain to thwart it, but we are not easily led down that path. It is Congress's job, not ours, to weigh such considerations as the relative importance of maintaining trade reciprocity on a commodity basis and of easing the task of American customs officials.

### II. The #1553 Microscope Dissecting Kits

The #1553 Microscope Dissecting Kits contain an inexpensive compound optical microscope about $4\frac{1}{2}$ inches long and $\frac{1}{2}$ inch in diameter, shaped somewhat like a fountain pen, and several tools of the type conventionally used for dissecting specimens. Each kit is contained in a small wooden box which is internally contoured to accept and removably retain the components of the kit. These kits have also been classified under Item 651.75, TSUS, but on this part of its appeal it is Tanross's contention that the microscope contained in the dissecting kits should be classified under TSUS Item 708.71 as a compound optical microscope not provided with means for photographing or projecting the image and valued at not over $25, while the rest of the kits should be classified under the same item by virtue of Headnote 4, Subpart A, Part 2, Schedule 7, which reads:

> Sets comprised of tools, implements, and other articles fitted into and imported with cases containing microscopes provided for in item 708.71, and ordinarily sold at retail, and used, in conjunction with such microscopes, are classifiable therewith.

Oddly enough, the only element among all the above still in contention—Tanross having prevailed below on all other points —is whether the dissecting tools imported with the microscopes are used with the microscopes with which they are imported. The court below held that Tanross had failed to "support its burden of proof" on that element of its protest and overruled the protest.

The proof Tanross offered to establish this point consisted of a sample of the imported kits and the testimony of Mr. Richard Lee Korte, service manager for Tasco Sales, Inc. (a companion company of Tanross Supply Co.), who was qualified as a repairman of microscopes and related equipment, including dissecting instruments. The kits we have already described, and we set forth below all of Mr. Korte's testimony elicited on direct

8. The lower court sought additional support in a quotation from page 148 of Volume 6 of the United States Tariff Commission's Summaries of Trade and Tariff Information, published in 1968. This quotation includes the clause "these sets ['sets covered by this summary (TSUSA item 651.7560)'] may include items not provided for as separate articles under subpart 3E" and numerous examples of sets including two or more articles from that subpart and other articles not from that subpart, all of which sets the Tariff Commission states to be within the purview of TSUSA Item 651.7560. During oral argument, counsel for Tanross specifically admitted that some of the examples were legally correct, and neither in its brief nor on oral argument has Tanross challenged the authority of the 1968 Summaries.

examination on the subject of the use of the implements imported with the microscope (R. 32–33, 35):

Q. Now, you mentioned that you had also repaired the dissecting instruments and the like. A. Yes, sir.

Q. Are you referring to the instruments that are contained in Exhibit 3? A. No, sir.

Q. Are you familiar with the instruments that are contained in Exhibit 3? A. Yes, sir.

Q. What are they used for?

Mr. Sosnov: Objection. This man was qualified as a repair man of microscopes, and simple familiarity is insufficient as to other uses.

Chief Judge Rao: Objection overruled. If you know.

The Witness: I know. They are used in conjunction with a microscope for dissecting specimens.

By Mr. Benjamin:

Q. Let's analyze that statement, they are used for dissecting, what does that mean? A. To cut apart.

Q. Specimens, what do you refer to as specimens? A. Any material that would be viewed under the microscope.

Q. Now are they used in conjunction with 3–A, that microscope?

Mr. Sosnov: Objection. This man has not been qualified as to this. He is simply a repair man.

Chief Judge Rao: Do you know what they are used for?

The Witness: Yes, sir.

Chief Judge Rao: What are they used for?

The Witness: To dissect the specimens to be viewed in conjunction with the use of this microscope.

By Mr. Benjamin:

Q. Would that be in the laboratory or in the field? A. It could be done in either place, generally in the field with this particular unit.

\* \* \* \* \* \*

Q. Have you used this particular microscope in connection with the dissecting kit personally at any time? A. No, sir.

On cross-examination, Mr. Korte testified (R. 37, 39):

Q. You testified on direct examination that you never used the microscope with the kit? A. This microscope?

Q. Yes. A. Yes, sir.

\* \* \* \* \* \*

Q. Mr. Korte, have you ever personally performed any experiments with this kit? A. No, sir.

Q. Have you ever seen this kit being used out in the field or fields? A. No, sir.

Q. Have you seen this kit being used in the laboratory? A. No, sir.

The court below held that "for plaintiff to succeed in its claim for classification of the #1553 dissecting kits within the provisions of item 708.71 and headnote 4, subpart A, part 2, schedule 7, *supra,* the record must reflect chief use of the microscopes in issue in conjunction with the tools or implements imported in the same kits," importing the word "chief" from General Headnote 10(e) (i) of the Tariff Schedules. With this importation we have no quarrel. Commenting on the record, the court observed that:

> Apart from the contradictory nature of some of the testimony offered by plaintiff [an apparent reference to the fact that on cross-examination Mr. Korte was forced to retract certain direct testimony on another subject entirely], the record discloses that the only witness called to testify had not personally used the #1553 microscope dissecting kits in issue and had never seen the kits being used in the field or any laboratory.

The court then refused to take judicial notice of the chief use of the implements and proceeded to overrule Tanross's protest "For failure to support its burden of proof" on that element of its case.

## A. *Sufficiency of the Evidence*

As we stated above, Tanross offered two forms of evidence to prove that the implements imported with the microscope in each #1553 Microscope Dissecting Kit were used chiefly with the microscope with which they were imported, but the opinion of the court below discusses only the testimonial evidence and, finding that wanting, concludes that the protestant had failed to make out its case. Apparently, the lower court did not even consider the inference to be drawn from the real evidence on this point, the sample kit itself. In this we find error. As we have many times noted, a sample is potent evidence, and in this case, based on the packaging of the implements with the microscope in each kit and their specific adaptation for use in dissecting specimens in a manner suitable for use with a microscope, we find inescapable the inference that the chief use of the implements is with the microscopes with which they are imported. However, the attention of the court below and of both parties on appeal having been directed primarily to the testimonial evidence, we believe comment on it is in order as well.

On direct examination Tanross's sole witness testified that the implements in question were used "To dissect the specimens to be viewed in conjunction with the use of this microscope," which was an adequate statement of the element in controversy, but on cross-examination he disclaimed all personal knowledge of the implements' use. Accordingly, his statement on direct can only be read as a declaration of what he believed to be obvious from the implements' design and/or the fact of their being fitted into a case with the microscope. Read in that fashion, his testimony carries only the weight given it by his expertise on that subject, and, as we have noted above, he was qualified only as a *repairman* of microscopes and related equipment, including dissecting instruments. This, of course, was the ground of the Government's objection to the original admission of Mr. Korte's testimony on this subject, and the trial judge, who later wrote the lower court's opinion in this case, overruled the objection. Nevertheless, the same judge who ruled the testimony admissible apparently thought it insufficient to make out Tanross's case.

Tanross makes much of the fact that Mr. Korte's testimony was uncontroverted, arguing in effect that, if the evidence adduced by the party having the burden of producing evidence on a given point is admissible and uncontroverted, the point must be regarded as proven. In doing so, Tanross confuses the admissibility of evidence with the weight to be given it. It should be borne in mind that the court below acted as both the arbiter of admissibility and the trier of facts.

In its capacity as arbiter of admissibility, the trial court had only to determine that Mr. Korte's evidence was relevant and competent in the sense that his special training and/or experience qualified him to offer his opinion on the point in issue, McCormick on Evidence, § 69, p. 149 (1954). On the latter point, the court evidently believed that Mr. Korte's field of expertise as a repairman of microscopes and dissecting instruments, though not precisely that of an expert in the *use* of dissecting instruments, was sufficient to make his opinion of some probative value. On relevancy there could be no question, since Mr. Korte testified precisely on the fact in issue.[9] Accordingly, the trial court held Mr. Korte's testimony admissible.

In its capacity as trier of facts, the trial court had to determine whether Tanross had sustained its burden of persuading it that the implements were used chiefly with the microscope. The lower court held it insufficient to prove the point to which it was directed despite lack of rebuttal evidence.

---

9. See Mannesmann-Meer, Inc. v. United States, Cust. & Pat.App., 433 F.2d 829, decided October 29, 1970, on the question of the admissibility of testimony directed to the ultimate facts.

However, Mr. Korte's testimony was not the only evidence Tanross offered to prove chief use. It also introduced a sample. Accordingly, the question before us is whether the lower court's decision was clearly contrary to the weight of all the evidence. We conclude that it was, and we therefore reverse as to this branch of the appeal.

## B. *Judicial Notice*

Although our resolution of this appeal makes it unnecessary for us to pass directly on the propriety of the lower court's refusal to take judicial notice of the chief use of the implements imported with the microscopes in this case, we note that the lower court apparently refused to take judicial notice, not because it doubted that their chief use was what the importer declared it to be, but because it felt precluded from so doing by our holding in L. Tobert Co. v. United States, 41 CCPA 161, C.A.D. 544 (1953), that:

> While judicial notice may be taken of well known uses of an article, chief use is a question of actual fact which, in a case of this character, should be established on the basis of positive testimony representative of an adequate geographical cross section of the nation. [*Id.* 41 CCPA at 164.]

While that sentence taken in isolation might be read as requiring an elaborate proof of chief use in this case, we think that a careful reading of the entire opinion does not so require.

In *Tobert,* one side was contending that silver-plated candlesticks and candelabras were "illuminating articles" within the meaning of the applicable statutory provision, while the other was contending that such a candlestick or candelabra "serves merely as a *decorative* holder for the *illuminating device, i. e., the candle.*" *Id.* at 163 (emphasis in the original). Both sides put forward witnesses supporting their respective positions, and

"Testimony ranging from the dogmatic to the confused was adduced bearing on the extent of illumination provided by lighted candelabras, as well as testimony relating to the question of whether lighted candelabras were ever used as the sole source of illumination." *Id.* at 164. With this in mind, we feel sure that what the court meant by "in a case of this character" was "in a case in which there is controversy between the parties concerning which of two or more uses of an article is the chief use."

There is nothing in *Tobert* to suggest that this court will not, or that the Customs Court should not, take judicial notice of either *a* use of an article or of *the* chief use of an article, if the fact to be judicially noticed is an appropriate subject for such notice. Indeed, the court in *Tobert* went so far as to state specifically that it thought it "hardly disputable that candlesticks and candelabras are, in fact, designed to be chiefly used in the household and intended to function as a device for holding a candle." *Id.* at 163. Where a fact is so certainly known as to make it indisputable among reasonable men, judicial notice may be taken of that fact. McCormick on Evidence, § 324, p. 689. Applying this rule here, we think it indisputable that the "tools, implements, and other articles fitted into and imported with cases containing * * * [the microscopes in suit], and ordinarily sold at retail * * * in conjunction with such microscopes" are also *used* chiefly with such microscopes, and we so hold as an alternative ground for our decision.

## CONCLUSION

The judgment below overruling the protest to the classification of the #1000 Educational Kits is accordingly affirmed, and the judgment overruling the protest to the classification of the #1553 Microscope Dissecting Kits is accordingly reversed.

Modified.