**KAROWARE, INC.**

v.

**UNITED STATES.**

**C.D. 4681.**

United States Customs Court.

Dec. 23, 1976.

Shaw & Stedina, New York City (Charles P. Deem, New York City, of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C. (John A. Gussow and Robert Masters, trial attys., New York City), for defendant.

RE, Judge:

The question presented in these four cases, consolidated for the purposes of trial, pertains to the proper classification, for cus-

toms duty purposes, of certain merchandise exported from Japan during 1968, 1969 and 1970. The merchandise consists of wine racks, and different types of wooden bars, imported together with glassware, and some with bar tools.

The various articles, invoiced as wine racks, keg bars, castle bars, tavern bars, executive roll top desk bars, small keg bars, treasure chest bars, cube bars, wine barrel bars, and bookshelf bars, were classified by the customs officials under different provisions of the Tariff Schedules of the United States [TSUS] as:

a) other household utensils not specially provided for, of wood, under item 206.97, TSUS, as modified by T.D. 68–9, with duty at the rate of 15, 13 or 11.5 per centum ad valorem;

b) boxes, cases or chests of wood, under item 204.40, TSUS, with duty at the rate of 16⅔ per centum ad valorem; or

c) articles of wood, not specially provided for, under item 207.00, TSUS, as modified by T.D. 68–9, with duty at the rate of 10 per centum ad valorem.

Plaintiff protested these classifications, and claimed that the articles should properly have been classified as furniture under item 727.35, TSUS, as modified by T.D. 68–9, and assessed with duty at the rate of 9, 8 or 7 per centum ad valorem. At the trial, however, plaintiff abandoned its "furniture" claim as to all of the bars except the keg bars, the castle bars, the tavern bars, the executive roll top desk bars,* and the bookshelf bars.

Merchandise invoiced as glassware, consisting of shot glasses, decanters and beakers, imported together with the bars, was separately classified as glassware under items 546.52 and 546.54, TSUS, with duty at various rates, depending upon the date of entry. Plaintiff claims that the glassware should have been classified as entireties with the bars with which imported. Hence,

it is claimed that the glassware is dutiable at the rate at which the bars were assessed, or at the rate of the classification claimed to be correct for them.

The importations also consisted of cask bars which were also classified under two of the three aforesaid provisions for wood, except in one instance when they were classified as "furniture" under item 727.35 of the schedules. In addition to the glassware imported with the cask bars were ice buckets classified as articles not specially provided for, of aluminum, under item 654.10, TSUS, and tongs classified as hand tools, of iron or steel, under item 651.47, TSUS, assessed at various rates. The ice buckets and tongs were also claimed by plaintiff to be dutiable as entireties with the cask bars and glassware at the assessed rates with respect to the cask bars.

The merchandise in issue also included book bars and wonder bars. These bars were imported not only with glassware, but also with a set of bar tools consisting of a corkscrew, bottle opener, spoon and strainer or olive pick which were packed together in a cardboard box but not fitted. These bars were classified under item 651.75, TSUS, as sets, dutiable at the highest rate applicable to the articles in the sets subject to the highest rate of duty, i.e., the glassware (at 50 per centum ad valorem under item 546.-52, TSUS) in accordance with schedule 6, part 3, subpart E. Plaintiff claims that the book and wonder bars were improperly classified, and should have been dutiable "as entireties, with their glassware and tools, as boxes, cases, or chests of wood under item 204.40 or, as separately dutiable articles, under the same provision, with the glassware being classified under either item 546.50 or 546.54, depending upon its value."

The classification, and hence the rate of duty to be assessed on the imported merchandise, depend upon the answers to three main questions that are presented for the court's determination.

---

* The executive roll top desk bars in entry no. 276802 were classified under item 206.97 and in entry no. 371216 under item 207.00. The defendant admits error in the latter classification and submits that the bars are classifiable under item 206.97. This claim, however, was made in defendant's brief and, therefore, is not an issue before the court.

The first is whether the wine racks, the keg bars, the castle bars, the tavern bars, the executive roll top desk bars, and the bookshelf bars are "furniture," within the meaning of that term as used in the tariff schedules.

The second is whether all of the bars are dutiable as entireties, with the glassware, or with the glassware and bar tools, with which they were imported.

The third is whether the book bars and wonder bars were improperly classified as "sets" together with their glassware and bar tools.

At the trial plaintiff called two witnesses and introduced 21 exhibits, which included representative samples of the wine racks and all of the bars in issue. The defendant introduced four exhibits.

### Plaintiff's "furniture" claim: pertinent provisions.

On the first question presented, whether the wine racks and the five bars constitute "furniture," the pertinent provisions of the tariff schedules read as follows:

Classified under:

Schedule 2, part 1:

"Jewelry boxes, silverware chests, cigar and cigarette boxes, microscope cases, tool or utensil cases, and similar boxes, cases, and chests, all the foregoing of wood:

\*     \*     \*     \*     \*     \*

Other:

204.40     Not lined with textile fabrics  16⅔% ad val.

\*     \*     \*     \*     \*     \*

Household utensils and parts thereof, all the foregoing not specially provided for, of wood:

\*     \*     \*     \*     \*     \*

206.97     Other ..................... 10% ad val.

\*     \*     \*     \*     \*     \*

207.00   Articles not specially provided for, of wood ...................... 10% ad val."

Claimed under:

"Furniture, and parts thereof, not specially provided for:

\*     \*     \*     \*     \*     \*

Of wood:

\*     \*     \*     \*     \*     \*

Other:

\*     \*     \*     \*     \*     \*

727.35          Furniture other than chairs ........... 6% ad val."

Schedule 7, part 4, subpart A, headnote:

"1. For the purposes of this subpart, the term '*furniture*' includes movable articles of utility, designed to be placed on the floor or ground, and used to equip dwellings, offices, restaurants, libraries, schools, churches, hospitals, or other establishments, aircraft, vessels, vehicles, or other means of transport, gardens, patios, parks, or similar outdoor places, even though such articles are designed to be screwed, bolted, or otherwise fixed in place on the floor or ground; and kitchen cabinets and similar cupboards, seats and beds, and sectional bookcases and similar sectional furniture, even though designed to be fixed to the wall or to stand one on the other; \* \* \*."

### Plaintiff's "furniture" claim as to wine racks.

There is no dispute that the articles are in chief value of wood.

Both parties cite with approval, and agree with the reasoning and holding of this court in *Morris Friedman & Co. v. United States,* 69 Cust.Ct. 184, C.D. 4392, 351 F.Supp. 611 (1972). The question presented in the *Morris Friedman* case pertained to the dutiable status of rattan hanging chairs. Plaintiff contended that the hanging chairs were embraced within prior judicial determinations of the common meaning of the term "furniture," and that Congress, by the adoption of the headnote provision in schedule 7, part 4, subpart A, did not intend to restrict the classification of furniture to the articles specifically enumerated. The defendant argued that, whether or not the imported articles came

within the common understanding of "furniture," that term was statutorily limited by the headnote provision which set forth a restrictive definition that excluded the hanging chairs from classification as "furniture." The question, therefore, was squarely presented whether the headnote provision pertaining to "furniture" constituted a statutory definition restricting the articles classifiable as "furniture."

In overruling plaintiff's claim, the court concluded that the hanging chairs did not come within the purview of the headnote, and, consequently, were not classifiable as "furniture." Hence, this court held that the scope of the "furniture" provision of the tariff schedules is governed by the definition in headnote 1, that the headnote is both exclusionary and restrictive, and that it embraces only those articles expressly described.

The holding of the *Morris Friedman* case makes it clear that earlier judicial determinations, whether an article was "furniture" under previous tariff laws, are neither binding nor dispositive of the question whether the wine racks or the five bars are "furniture" under the tariff schedules.

Plaintiff asserts that the merchandise in question comes within the purview of the headnote definition since the record clearly shows that the wine racks are "movable articles of utilities designed to be placed on the floor," and that the bars are "kitchen cabinets and similar cupboards * * * designed to be fixed to the wall."

The defendant argues that, even if the court should find that the wine racks (and bars) are embraced by the headnote definition of "furniture," it must also be established that they are of a comparatively substantial nature and fulfill a comparatively important role for personal use, convenience, and comfort.

The wine rack is made of hard wood with a walnut finish. It consists of two parallel boards embedded in a stand, each board containing ten cylindrical holes. The boards are held together by three cross bars, two at the bottom and one at the top. The cylindrical holes are intended to hold wine bottles in a flat, cradled position for storage purposes. The overall measurements of the wine rack are 24 by 11 by 14 inches.

Plaintiff's first witness, Mr. Shulman, testified that he was plaintiff's warehouse and traffic manager for six years, and that his duties included receiving, shipping, inspecting and packing the imported merchandise. He was familiar with the products imported by plaintiff and, although he does not own one, he has seen the wine rack displayed on the floor. He stated that it was used on the floor because if it were higher "anybody can knock the thing over and then you've got a lot of damage on the floor." On cross-examination, he conceded that the wine rack could be used on a table as well as on the floor.

Plaintiff's other witness, Mr. Baller, whose duties were similar to those of an "overseer," was the sole stockholder and president of the plaintiff corporation. He agreed with Mr. Shulman that the wine rack is used on the floor, and stated that "otherwise, if you put [it] anywhere else, at any height, the bottles would break from the usage."

Plaintiff contends that it has successfully proven that the imported wine racks are "movable articles of utility designed to be placed on the floor," and are thus properly classifiable under the headnote provision for "furniture." Defendant, on the other hand, maintains that the record falls short of establishing that the wine racks were designed to be, or must be used on the floor or ground, or that they are of a substantial nature and fulfill a comparatively important role for personal use, convenience and comfort.

It is not disputed that the articles are "movable articles of utility." The question is whether they are "designed to be placed on the floor or ground." Research reveals that while the language of the pertinent headnote definition has been the subject of recent judicial decisions, this particular question is one of novel impression.

The Brussels Nomenclature greatly influenced the arrangement and classifica-

tion of the tariff schedules. The Brussels Nomenclature and its Explanatory Notes are therefore indicative of the legislative intent underlying the tariff schedules. See *Herbert G. Schwarz, dba Ski Imports v. United States*, 417 F.2d 1391, 57 CCPA 19, C.A.D. 971 (1969).

In the case of *Sprouse Reitz & Co., Frank P. Dow Co., Inc. v. United States*, 67 Cust.Ct. 209, C.D. 4276, 332 F.Supp. 209 (1971), cited by the defendant, this court noted the similarity of provisions of the Brussels Nomenclature and the tariff schedules on the subject of furniture.

"Chapter 94.00 of the *Explanatory Notes to the Brussels Nomenclature* 1955, Volume 3, pages 1145–1146 (1964), contains the following pertinent language:

For the purposes of this Chapter, the term '*furniture*' is to be taken to mean:

(A) Any 'movable' articles (*not* included under other more specific headings of the Nomenclature), which have the essential characteristic that they are constructed for placing on the floor or ground, and which are used, mainly with a utilitarian purpose, to equip private dwellings, hotels, theatres, cinemas, offices, churches, schools, cafés, restaurants, laboratories, hospitals, dentists' surgeries, etc., or ships, aircraft, railway coaches, motor vehicles, caravan-trailers or similar means of transport. (It should be noted that, for the purposes of this Chapter, articles are considered to be 'movable' furniture even if they are designed for bolting, etc., to the floor, e. g., chairs for use on ships.) Similar articles (seats, chairs, etc.) for use in gardens, squares, promenades, etc., are also included in this category.

(B) The following even if they are designed to be fixed to the wall or to stand one on the other:

(i) Kitchen cabinets and similar cupboards.

(ii) Folding seats and beds.

(iii) Unit bookcases and similar unit furniture.

*Except* for the goods referred to in sub-paragraph (B) above, the term 'furniture' is to be taken *not to apply* to articles used as furniture but designed for placing on other furniture or shelves or for hanging on walls. It therefore follows that the present Chapter *does not cover* other wall fixtures such as coat and hat racks, wall racks, key-boards, clothes-brush hangers and newspaper racks, nor furnishings such as radiator screens. Similarly, the Chapter *excludes* the following types of goods *not* designed for placing on the floor:—small articles of cabinet-work and small furnishing goods of wood (*heading 44.27*), and office equipment of base metal (e. g., sorting boxes, paper trays) (*heading 83.04*)." (Emphasis in original.) 67 Cust.Ct. at 215, 332 F.Supp. at 213.

The Explanatory Notes indicate that the type of articles that are embraced by the statutory definition of "furniture" are expressly described as "movable articles" of utility designed to be placed "on the floor or ground," and that the only exceptions are certain enumerated articles. Moreover, specifically excluded are articles used as furniture, but designed for placing on other furniture or shelves, or for hanging on the walls.

After careful consideration of the relevant testimony and sample, the court is unable to find that plaintiff has borne its burden of proof that the wine racks are included within the pertinent headnote definition.

An examination of the illustrative wine racks reveals clearly that in construction, size, and weight, they can suitably perform the function of holding and storing bottles whether placed on the floor, on top of other furniture, or on a shelf. Indeed, in plaintiff's catalog, the wine rack is shown *standing* on top of a bar.

Plaintiff's witnesses testified that they observed the wine rack in use displayed on the floor. The reason stated was that if it were higher, "anybody can knock the thing

over," and there would be damage to the floor. This testimony is not convincing, and , as stated by Mr. Shulman on cross-examination, the wine rack could easily be used on a table as well as on the floor. The meager testimonial evidence in the record on this point supports the government's classification.

■ By the use of the word "designed," Congress intended to include only those articles that were particularly and especially constructed to be placed on the floor or ground. This test is not met merely because an article is susceptible or capable of being placed on the floor or ground. Hence, it is unnecessary to consider defendant's argument that, in addition to falling within the headnote provision, the article must be of a comparatively substantial nature and fulfill a comparatively important role for personal use, convenience and comfort.

In view of the foregoing, the court finds that the plaintiff has failed to rebut the presumption of correctness that attaches to the government's classification. Plaintiff's claim as to the wine racks is consequently overruled.

*Plaintiff's "furniture" claim as to bars.*

On plaintiff's claim that the bars also should have been classified as "furniture," the issue to be determined is whether the bars are included in the phrase "kitchen cabinets and similar cupboards * * * designed to be fixed to the wall * * *" within the meaning of the headnote definition of furniture.

Since the record does not suggest any distinctions of substance among the five bars, the following description is sufficiently accurate. The bars are highly decorative and are made of hard wood with either walnut, oak, or natural teak finish. They may be termed novelty articles, designed to resemble or depict the article which bears its name, such as keg, castle, etc. While they therefore differ in external physical appearance, common to all of the bars are shelves, precut with cylindrical holes, designed to hold glassware of various sizes

and bottles. All have front door openings, with four of them having two hooks on the top, one at each end, and the other having precut holes in the back, for hanging. Their overall dimensions range 14 to 20 inches in height, 4½ to 13 inches in depth, and 16 to 25½ inches in width.

Plaintiff asserts that the bars are embraced by the common meaning of the term "cupboard," and that they are similar in several significant respects to kitchen cabinets. Defendant urges that they are not similar to kitchen cabinets; that some of the articles are not primarily suited for hanging; and that they are all of minor importance in the home.

In support of its contentions, plaintiff relies heavily on the case of *Albert E. Price, Inc. v. United States*, 68 Cust.Ct. 50, C.D. 4334 (1972), *aff'd*, 476 F.2d 1354, 60 CCPA 127, C.A.D. 1095 (1973). In the *Price* case the court held that "spice cabinets" were not embraced in either the common meaning or the statutory definition of "furniture." Plaintiff, however, states that although the court found that the spice cabinets were not similar in any way to "kitchen cabinets," it nevertheless established a criterion for the words "kitchen cabinets" which plaintiff submits is met by the bars in issue. In support of its position plaintiff refers to its collective exhibit 2 (parts of catalogs of Sears, Roebuck & Company and the J. C. Penney Company) as containing illustrations of articles sold by them as "kitchen cabinets." Plaintiff suggests numerous similarities between the bars in issue and the "kitchen cabinets" depicted, with respect to their dimensions, weight and price.

Defendant indicates that the alleged similarities are specious and that, whereas kitchen cabinets are suitable "for holding many different types of articles," the bars, "because of the pre-drilled holes, are only suitable for holding cylindrical or conical shapes such as glasses." Moreover, defendant states that the bars are "only secondarily suited for hanging, and they are of 'minor importance' to the home."

Whether an importation is embraced by the tariff term "furniture," and particularly the words "kitchen cabinets and similar cupboards" of the headnote provision, was considered in the *Albert E. Price, Inc.* case, *supra*, also relied on by the defendant, and the previously decided *Sprouse Reitz & Co., Frank P. Dow Co., Inc.* case, *supra*.

In the *Sprouse Reitz* case the merchandise consisted of spice racks designed to be hung on the wall, presumably in the kitchen, having shelves intended to hold glass bottles of spices, one of them containing drawers to store tea bags, condiments, or other items. The plaintiff contended that the spice racks came within the common meaning of the term "furniture." The defendant, on the other hand, contended that the headnote provision constituted a statutory definition, and that the spice racks fell outside that definition.

In its opinion the court noted that, although the classification of the spice racks was governed by the tariff schedules, plaintiff's claim was not based on the statutory definition of the term "furniture" as found in the headnote, but rather on the common meaning of the word. From the testimony and the exhibits the court found that the spice racks were more decorative than utilitarian, were offered to the public as accessories to furniture, and were inexpensive. It observed that they could be described as appendages of the house designed for its ornamentation, and as "comparatively minor in importance so far as personal use, convenience and comfort are concerned." Hence, the court held that the spice racks were not included in the headnote provision, nor were they embraced by the common meaning of the term "furniture."

The plaintiff, in the more recent case of *Albert E. Price, Inc., supra*, argued as does the plaintiff here, that the merchandise fell squarely within the meaning of the term "furniture" as used in the tariff schedules, and that it was also embraced by the words "kitchen cabinets and similar cupboards." The merchandise in the *Price* case consisted of spice cabinets with a louver-door hutch and two drawers at the bottom. The de-

fendant contended that the articles were not embraced by the statutory words.

In finding that the spice cabinets did not come within the meaning of the term "furniture," as used in the tariff schedules, the court stated that they were predominantly similar in nature and use to the spice racks in the *Sprouse Reitz* case, and that *Sprouse Reitz* was, therefore, "*stare decisis* of the issues presented."

In affirming this court's decision in the *Price* case the appellate court inferentially also affirmed this court's decision in *Sprouse Reitz*. Of particular significance to the present case is the following statement of the appellate court in its affirmance of the *Price* case:

> "We share the view so aptly expressed by the Customs Court that:
>
> ' * * * the headnote discussion of furniture was, on its face, intended to certify the inclusion of furniture which was permanently fastened to the premises, either on the floor or on the walls, as opposed to furniture which was movable at will. In this respect, kitchen cabinets and similar cupboards were mentioned as examples of furniture which were capable of permanent placement. * * * '" 476 F.2d at 1356, 60 CCPA at 129–130.

Accordingly, it follows that the criterion for an article to be embraced by the words "kitchen cabinets and similar cupboards" is that it is capable of being *permanently fastened* to the wall and not movable at will, and not merely its shape, size, or dimensions as plaintiff contends.

The subsequent case of *Morris Friedman & Co. v. United States,* 69 Cust.Ct. 184, C.D. 4392, 351 F.Supp. 611 (1972) which dealt with rattan hanging chairs, is also pertinent. As noted previously, the court therein held that the headnote provision contained a definition of "furniture" which constituted a restriction upon the articles classifiable as "furniture." Consequently, since the hanging chairs in the *Friedman* case were not designed to be placed on the floor or ground, or to be fixed to the wall,

they did not come within the purview of the statutory headnote.

■ The reasoning and holdings of both the *Morris Friedman* and *Albert E. Price* cases indicate that, for classification as "furniture" within the statutory definition, more is required than that an article have hooks, and that it may possibly be hung from the wall. The precedential authority of those cases leads to the conclusion that the bars in issue are beyond the ambit of the statutory definition. On this aspect of the case suffice it to say that plaintiff's reliance on the *Albert E. Price* case is misplaced.

While it may be true, as plaintiff contends, that perhaps all of the bars fall within the dimensions of "kitchen cabinets," and may be hung on the wall, they do not have features for their permanent attachment to the wall. Furthermore, they are movable at will, and are designed to rest or stand on other furniture. This may be noted by an examination of plaintiff's catalogs which show that the castle bar, and the executive roll top desk bar, are either placed on the floor, or are standing on top of another article or shelf. The catalog states that the executive roll top desk bar is a "wall hanging or table top bar." Plaintiff's witness, Mr. Shulman, testifying about the executive roll top desk bar stated that "you can put it on a flat surface also." As for the keg bar it may be noted that it contains a handle at the top to facilitate its being carried from place to place. An examination of the nature and design of the samples of the imported bars compels the conclusion that it is most unlikely that they would be used as "kitchen cabinets."

Since the court finds that the bars in issue are not "kitchen cabinets," there is no basis for a finding that they are "similar cupboards." Furthermore, the court need not consider defendant's contention that the bars are of comparatively minor importance so far use, comfort and convenience are concerned.

On the question, therefore, whether the bars are "furniture" under the tariff schedules, it is the determination of the court that the plaintiff has failed to prove the correctness of its claimed classification, and its claim is therefore overruled.

### Plaintiff's "entireties" claim.

On the second question presented, whether the bars are dutiable as entireties with the glassware with which they were imported, plaintiff states that it has successfully proven that the bars and the glassware comprise a single article of commerce. Hence, plaintiff contends that they should be treated as an entirety for tariff purposes. It bases its contention on the physical and testimonial evidence that each of the bars together with the glassware was imported, designed, purchased, priced, advertised, sold at wholesale and retail, and used as a unit.

Defendant asserts that the record falls short of establishing that the bars and glassware were designed as a unit. Moreover, defendant submits that the facts fail to show that there has been a merger of their functions creating a new article of commerce as required by the customs law doctrine of entireties.

In support of its contention, plaintiff argues that the facts closely resemble those of three recently decided cases: *Miniature Fashions, Inc. v. United States,* 54 CCPA 11, C.A.D. 894 (1966), *The Nissho American Corp. v. United States,* 64 Cust.Ct. 378, C.D. 4005 (1970), *appeal dismissed,* 57 CCPA 141 (1970) and *A. N. Deringer, Inc. v. United States,* 71 Cust.Ct. 103, C.D. 4482 (1973).

In the *Miniature Fashions, Inc.* case, the imported merchandise consisted of "cabana sets" described as "two-piece shirt-short sets." The appellate court, reversing the decision of this court, held that the garments were classifiable as an entirety since the evidence established that they were designed as a unit, matched as to color, print and fabric, imported as a unit and pinned together, invoiced as a unit, and sold as a unit both in wholesale and retail channels.

On the authority of the *Miniature Fashions* case, this court decided that the merchandise in the *Nissho* and *Deringer* cases was also properly dutiable as entireties.

In the *Nissho* case, the imported merchandise consisted of shirts, which were part of a shirt and longie set. They consisted of a boy's plaid flannel shirt and corduroy pants lined with the same plaid material as the shirt, and having the pocket trimmed with the same material. They were designed, purchased, imported, invoiced, advertised, and sold at wholesale and retail as a unit, and not separately.

The merchandise in the *Deringer* case consisted of so-called "bra-kini" sets. The sets consisted of unstructured brassieres of stretch material intended to fit all, or a number of sizes, and bikini pants. They were matched as to fabric, color, print, and trim, and were imported in sets. Each set, sold at wholesale and at retail as a set on a hanger, was designed as a unit to be worn together. They were offered in sets to satisfy a consumer demand for coordinated underwear. The upper portion was distinct from sized and structured brassieres which were sold separately.

Defendant submits that the facts of the *Miniature Fashions* and *Deringer* cases are clearly distinguishable from those presented here. It indicates that the merchandise in the cases cited was matched clothing and, when coordinated by color, print and fabric, created a new article of commerce. The bars and the glassware are not "matched" in any corresponding way. In the present case the components of the unit retain their separate and distinct functions: the bars for serving and storing beverages and the glasses for drinking.

Numerous cases can be readily cited that discuss the customs law doctrine of entireties. Although the doctrine may be formulated clearly, its application is not always free from doubt. The difficulty of application is noted in *Lafayette Radio Electronics Corp. v. United States*, 421 F.2d 751, 57 CCPA 62, C.A.D. 977 (1970) wherein the Court of Customs and Patent Appeals stated:

"* * * there are no ironclad rules or universally applicable principles for determining whether merchandise should be classified and dutied as entireties.

* * *" 421 F.2d at 754, 57 CCPA at 66.

As stated by the appellate court in the *Miniature Fashions* case:

"The lower court stated, and we agree:

'The difficulty which is experienced in this type of case is not so much the formulation of a workable rule as it is the application of the provisions thereof to a given factual situation. Where it is apparent that the components of an importation have no useful function until joined into a single entity, it is, of course, relatively easy to say that the result constitutes an entirety. Where, however the several components of a unit are to any extent alone susceptible of a separate use, the question of whether their individual identities are subordinated to the newly created entity is not so readily answered.'" 54 CCPA at 15.

Nevertheless, a useful formula, which has often been cited with approval, is found in *Donalds Ltd. v. United States*, 32 Cust.Ct. 310, 315, C.D. 1619 (1954), wherein it was stated:

"* * * If what is imported as a unit is actually and commercially two or more individual entities which, even though imported joined or assembled together, nevertheless, retain their individual identities and are not subordinated to the identity of the combination, duties will be imposed upon the individual entities in the combination as though they had been imported separately. Conversely, if there are imported in one importation separate entities, which by their nature are obviously intended to be used as a unit, or to be joined together by mere assembly, and in such use or joining the individual identities of the separate entities are subordinated to the identity of the combined entity, duty will be imposed upon the entity they represent."

The testimony of plaintiff's witnesses is to the effect that the bars were imported with the glassware packed separately, and placed inside the bar; they were sold to plaintiff's customers as a unit; retailers displayed and sold them together;

and they are used together. When broken glasses have to be replaced, they must be bought from the plaintiff since identical glasses are not available elsewhere. If a customer found a shot glass broken after he opened the keg bar, he would not return the entire bar in order to obtain the replacement for the broken glass, and "the value of the entire bar is not lost because one of the shot glasses is broken." Depending upon the circumstances, there may or may not be a charge for the replacement glasses. The plaintiff orders and purchases the glasses separately from the bars.

On the doubtful question whether the bars and glassware were designed as a unit, plaintiff's first witness, Mr. Shulman, testified that he did not participate in the design of the merchandise, nor did he ever visit the production facilities in Japan.

The other witness, Mr. Baller, on direct examination, testified that the bars were designed as a unit with the glassware. On cross-examination, however, his testimony was inconclusive and less certain. When asked if the glassware was designed as a unit with the bars, he replied: "They are not designed for any particular bar insofar as it determines the various sizes that we have."

During cross-examination, the witness also testified that the glassware was chosen from catalogs or from submitted samples; all of the glasses in the bars, with the exception of the executive roll top desk bar, were interchangeable; the bars and glassware and the tools are not produced in the same factory in Japan; the plaintiff does not purchase the imported articles from the manufacturers but through an agent who submits to plaintiff the unit price for the articles which are bought in a "package deal." From all of the testimony, some of which is ambiguous and unconvincing, the court cannot find that plaintiff succeeded in establishing that the bars and glassware were designed as a unit.

Even apart from the question whether the bars and glassware were designed as a unit, the facts in the present case differ substantially from those upon which plaintiff relies. In the *Miniature Fashions* case, if one of the parts in the "cabana set" was damaged, the entire set had to be returned for credit or replacement. One component of the set had no value without the other. In the present case, when a glass was broken, it was returned alone without the bar, and the replacement of the glass had no effect upon the value of the bar.

The component parts of the "cabana set" (the shirt and shorts) in the *Miniature Fashions* case; the shirt and longie set (the shirt and pants) in the *Nissho* case; and the "bra-kini" set (the brassiere and bikini) in the *Deringer* case were subordinated to the whole having a single use, and when combined, created a new article of commerce. Moreover, in *Miniature Fashions* and in *Deringer,* the parts, when combined, became known in the trade by a new name, viz., "cabana set" and "bra-kini set." In the present case, the facts do not show that the component parts, the bars and the glassware, have been subordinated to create a new article of commerce which bears a name different from any of its parts. In view of the factual differences, the cases cited by plaintiff are not authority for the classification of the bars and glassware as entireties.

It cannot be disputed that the bars and glassware are separate, and perform their usual functions. The bars are attractive and can be used in the home or office as decorative articles, or for the storage and service of beverages. The glasses of various sizes are interchangeable and can be placed in any one of the bars in which they fit. Additionally, a glass, when removed from the bars, can be used for the same purpose as any other glass.

On the exhibits and testimony of record the court finds that the bars and glassware retain their separate identity and function. This conclusion is supported by two additional cases recently decided by this court: *Mobilite, Inc. v. United States,* 70 Cust.Ct. 359, C.R.D. 73–11, 358 F.Supp. 267 (1973) and *Novelty Import Co., Inc. v. United States,* 67 Cust.Ct. 447, C.D. 4318 (1971).

In the *Mobilite* case the merchandise consisted of electric light bulbs and lamps which were unassembled but packed together for shipping purposes. They were classified as entireties under item 653.39 of the tariff schedules which provides for "other" illuminating articles. Plaintiff claimed that the lamps and bulbs should have been liquidated separately, the lamps under item 653.39, and the bulbs under the *eo nomine* provisions for bulbs in items 686.90 and 687.30. Defendant contended that the bulbs were correctly classified as a single entity with their lamps.

In holding that they were improperly classified as entireties under item 653.39, the court rejected defendant's argument that both the "power source" (lamp) and "illuminating factor" (bulb) comprise an illuminating article, and thus were a single entity when imported together. The court reasoned that the bulbs were the same as those which were bought and sold in the United States as separate articles. They had a separate commercial value, and, although placed together and shipped with the lamps, they retained their separate tariff identities.

In the *Novelty Import* case the importation consisted of a standard key chain that was attached to a "Nud Nick," a small animated head resembling an imp. The appraisement of the merchandise was predicated on the basis that it constituted an entirety. In overruling the appraisement, Judge Maletz wrote the following which is pertinent to the present case:

" * * * The independence of these components is readily apparent from a casual examination of the sample. Indeed, the key chain to which the 'Nud Nick' head is attached is by design, function and actual use a general purpose article which has obvious multiple uses in conjunction with numerous articles. See e. g., *Gene Miller, Atwood Imports, Inc. v. United States,* 59 Cust.Ct. 212, C.D. 3125 (1967), *dismissed and remanded on rehearing* 63 Cust.Ct. 452, C.D. 3934 (1969). Thus, the court can take judicial notice of the fact that in addition to or in conjunction with its use as a key chain, the key chain utilized with the imported 'Nud Nick' head is of a type that has been used with such diverse items as police whistles, sink stoppers, miniature flashlights, umbrellas, etc. What is more, the ease with which the key chain can be detached from the 'Nud Nick' head provides indication that the two components herein, the key chain and the head, have not lost their separate commercial identities. For it is quite apparent that should a key chain become defective, another key chain of like construction or even a piece of string could be used in lieu thereof. Similarly, the novelty nature of the 'Nud Nick' head is not destroyed by its removal from the key chain." 67 Cust.Ct. at 449.

The same may be said in the present case. Not only are the glasses "general purpose articles," but when removed from the bars they retain their separate identity and utility. The novelty nature of the bars is not affected by removal of the glassware; nor is the independence of the book, wonder, and cask bars affected by the addition of the bar tools or the ice buckets and tongs. Furthermore, the tools, and the ice buckets and tongs are also fully independent, and may be used for their intended purpose with or without any bar.

From the foregoing, it is the determination of the court that the independence of the bars, glassware and tools (and the ice buckets and tongs of the cask bars) is fully retained, and consequently, they are not an entirety for tariff purposes.

Accordingly, plaintiff's claims that the bars are classifiable as entireties with the glassware, or with the glassware and tools, or with the glassware, ice buckets and tongs, are overruled.

*Plaintiff's "sets" claim.*

The third question to be resolved is whether the book bars and the wonder bars, together with their glassware and bar tools, were improperly classified as "sets" within item 651.75 of the tariff schedules.

Plaintiff claims that the book and wonder bars should have been classified "as entireties, with their glassware and tools, as boxes, cases, or chests of wood under item 204.40 or, as separately dutiable articles, under the same provision, with the glassware being classified under either item 546.50 or 546.54, depending upon its value."

Item 651.75 of the tariff schedules reads as follows:

"Sets (except sets specially provided for) which include two or more of the tools, knives, forks, spoons, or other articles provided for in different rate provisions of this subpart .................... The rate of duty applicable to that article in the set subject to the highest rate of duty."

As stated previously, the book bars were imported with bar tools, consisting of a corkscrew, bottle opener, spoon and a strainer, packed together in a cardboard box which was placed in the lower drawer of the bar. The wonder bars contained a similar assortment, except that a pick was included instead of a strainer. These bar tools were the articles which the customs officials found brought the entire importation, consisting of bars, glassware and tools, within item 651.75 of the tariff schedules, and therefore subject to the rate of duty applicable to its highest component, viz., the glassware.

Plaintiff urges that the "sets" provision embraces only sets similar to the bar tools of the present case, or sets of knives, forks and spoons. Plaintiff submits that the combination of the bar tools and glassware is a collection of dissimilar articles and, therefore, does not come within the purview of that tariff provision.

Defendant contends that, in the adoption of the "sets" provision, it was not the intention of Congress to restrict it to similar items, and urges that it also includes items that naturally complement one another in use.

In support of their respective positions, the parties call the court's attention to certain excerpts from the *Summaries of Trade and Tariff Information* (1968), Schedule 6, Volume 6, and to the case of *Tanross Supply Co., Inc. v. United States*, 433 F.2d 1332, 58 CCPA 26, C.A.D. 1000 (1970).

The quotation from the "1968 Summaries," cited by the parties, at page 148 reads as follows:

"The sets covered by this summary (TSUSA item 651.7560) are those having two or more of the tools provided for in the aforementioned subpart 3E; these sets may include items not provided for as separate articles under subpart 3E. Sets composed wholly of knives, forks, and spoons, and pedicure and manicure sets are covered in separate summaries in this volume (6:6). The following are typical of the sets covered in this summary: Barbecue sets consisting of a turner, fork, tongs, basting brush, and box; kitchen tool sets consisting of a potato masher, icing spatula, basting spoon, turner, ladle, pot fork, and rack; carpenters' sets containing a screwdriver, hammer, adjustable wrench, measuring tape, combination pliers, utility knife, and putty knife; bar sets containing an ice pick, double jigger, spoon, can and bottle opener, strainer, corkscrew, stand, and box; miniature garden tool sets consisting of a fork, spade, and cultivator; file sets; ignition wrench and plier sets; and sets of scissors. Cases, boxes, or containers of the types ordinarily sold at retail with the tools or other articles in the set are classifiable with such articles if imported therewith."

Plaintiff cites the explicit reference to "bar sets" as "typical" of the sets intended by Congress to come within the purview of the tariff provision, and emphasizes that the articles described are similar to those contained in the bar tools sets in this case.

Defendant, on the other hand, quotes the phrase: "Cases, boxes, or containers of the types ordinarily sold at retail with the tools or other articles in the set are classifiable with such articles if imported therewith."

It contends that these words reveal the congressional intent to include in the "sets" provision articles other than those enumerated in subpart 3E when they are associated in use with one another.

While the *Summaries of Trade and Tariff Information,* published by the United States Tariff Commission, are not controlling of congressional intent, they are persuasive for the purpose of resolving doubtful questions relating to the meaning and scope of tariff provisions. It is apparent from the *Summaries* that the "sets" provision of item 651.75 may include articles not provided for as separate articles in the tools, cutlery, forks and spoons provision of subpart 3E. Furthermore, contrary to plaintiff's view, the inclusion in "typical sets" of a double jigger and stand, as part of a bar set, and a measuring tape, as part of a carpenter's set, *inter alia,* is indicative of an intention to include in item 651.75 sets having dissimilar items which are usually associated in their use, and complement one another.

An examination of the wonder bars and book bars indicates that they were designed to hold glassware and bar tools. It is clear that each of these articles was intended to be used in conjunction with, and to complement one another in the storage, preparation and serving of beverages. The bars have shelves, either straight or pre-drilled, to hold both glasses and decanters. The book bar is equipped with several permanent clamps designed to hold the bar tools. In the wonder bar they may be stored in a bottom drawer. A novelty feature of the wonder bar is that it automatically opens when the bottom drawer is pulled out.

An examination of the bars, together with a study of the *Summaries of Trade and Tariff Information* and the *Tanross* case, lead to the conclusion that the merchandise was properly dutiable as classified by the customs officials.

The merchandise in the *Tanross* case was described as "# 1000 Educational Kits and # 1553 Microscope Dissecting Kits." While both "kits" were classified under item 651.-75, they presented different questions, and were separately discussed by the appeals court. In the present case both parties rely upon that portion of the appellate decision which dealt with the "# 1000 Educational Kits."

The "Educational Kits" consisted of laboratory beakers, test tubes, chemicals, a plastic-handled knife, a needle probe, a dissecting board, an instruction book, and other items used in the preparation of specimens for viewing under a microscope, but did not contain a microscope. The collector found that the plastic-handled knife and the needle probe brought the entire kit under the duty rate provision applicable to the plastic-handled knife.

There were two questions to be resolved. First, were the entire kits "sets" within the meaning of item 651.75, or were the plastic-handled knife and the needle probe, themselves, "sets." Second, should imported articles be classified as "sets" under this tariff item when the unit by which the goods are imported and sold, both at wholesale and retail, contains two or more of the articles enumerated in different rate provisions in subpart 3E, but also contains many other articles not provided for in that subpart.

In affirming the holding of this court, that the "# 1000 Educational Kits" were "sets" within the meaning of the tariff item, the Court of Customs and Patent Appeals enunciated a test or standard which is applicable here. The court said:

"As the court below noted, 'Item 651.75 of the Tariff Schedules of the United States with which we are here concerned projects a new concept in the assessment of import duties.' The word 'sets' as used therein certainly is not, as Tanross would have us hold, simply a synonym for 'entireties,' but it is not easy to say just what Congress did mean when it used the word. There is very little legislative history to guide us in interpreting this new provision, but what there is in no way suggests that the word 'set' should be given, in this context, any meaning other

than its usual meaning of 'A number of things of the same kind ordinarily used together; a collection of articles which naturally complement each other, and usually go together; an assortment; a suit; as, a *set* of chairs, of china, of books, of teeth, etc.' Webster's New International Dictionary (2d ed. 1956). Since the # 1000 Educational Kits are '*a collection of articles which naturally complement each other, and usually go together,*' all being items used in connection with the preparation of specimens for viewing under a microscope and not being simply an aggregation of disparate articles imported together for shipping convenience, we agree with the court below that they are 'sets' within the meaning of TSUS Item 651.75." (Emphasis added in part.) 433 F.2d at 1335, 58 CCPA at 30–31.

The two bars, together with their glassware and bar tools, to borrow the words of the appellate court, are not "simply an aggregation of disparate articles imported together for shipping convenience," 433 F.2d at 1335, 58 CCPA at 31. They are clearly "a collection of articles which naturally complement each other, and usually go together", *Id.* 433 F.2d at 1335, 58 CCPA at 30–31. The bars, glassware and bar tools comprise a multifunctional unit for the decorative display of articles used to store, prepare and serve beverages. Indeed, plaintiff's illustrative catalogs depict all of the articles as being offered for sale together.

This determination is also in accord with the holding in the case of *United States v. Mark Cross Co.*, 4 Ct.Cust.Appls. 274, T.D. 33489 (1913). In the *Mark Cross* case the question pertained to the meaning of the term "set" as used in paragraph 452 of the Tariff Act of 1909. The merchandise consisted of certain leather cases, boxes and bags fitted with toilet or other articles, designed for one's personal use and convenience. The court held that any combination of toilet articles, in cases and boxes, came within the definition of "traveling set" provided they were made up to be carried by the traveler, and were designed for the toilet or care of his person or clothing while traveling.

These authorities lead to the conclusion that the book bar and wonder bar, together with their glassware and bar tools, were properly classified under item 651.75 of the tariff schedules. Since plaintiff has not borne its burden of proof that they were incorrectly classified, its claim is overruled.

■ As a consequence of this determination an importer is made to pay the higher rate of duty for importing articles in a set, which, if imported separately, would bear a lower duty. Although this may seem inequitable and anomalous, it is clearly a policy determination within the exclusive province of the Congress. See *Authentic Furniture Products, Inc. v. United States*, 68 Cust.Ct. 204, 210, C.D. 4362, 343 F.Supp. 1372, 1377, aff'd, 486 F.2d 1062, 61 CCPA 5, C.A.D. 1109 (1973), and cases cited therein. That the question was considered, and the result reflects the policy judgment of the legislature, may be gleaned from the following explanation found in the *Explanatory and Background Materials, Tariff Classification Study*, Schedule 6 (1960) (at page 200):

"Item 651.75 is a new provision covering sets which is not derived from any specific provisions of the current tariff act. It is designed primarily to facilitate customs administration. Many articles of types provided for in this subpart are bought and sold as sets, and this proposed provision acknowledges this fact and provides realistically therefor. Although this provision would apply to the entire set the highest rate applicable to any article in the set, this would not impose undue hardship on importers inasmuch as they could always import the various articles and obtain the regular rates if they deferred the packaging of them as sets until after importation. It is significant to note that the proposed provision corresponds with a standard provision of the Brussels Nomenclature."

■ In areas of unquestioned constitutional authority, the judicial function to

interpret and apply statutes does not include the power to judge their wisdom, or the legislative policy that prompted their enactment.

In view of the foregoing, it is the determination of the court that the plaintiff has not rebutted the statutory presumption of correctness, and has failed to establish that:

1. the wine racks, the keg bars, the castle bars, the tavern bars, the executive roll top desk bars and the bookshelf bars are "furniture," within the meaning of that term as used in the tariff schedules;

2. the bars are dutiable as entireties with the glassware, or with the glassware and tools, or with the glassware, ice buckets and tongs, with which they were imported; and that

3. the book bars and wonder bars were improperly classified as "sets" together with their glassware and tools.

Plaintiff's claims are overruled, and the classifications of the customs officials are sustained.

Judgment will issue accordingly.