(C.D. 4815)

SIMMON OMEGA, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 71-12-02126

(Decided August 7, 1979)

*Serko & Simon*, Esqs. (*Joel K. Simon, Carl R. Soller* and *Margaret H. Sachter*, Esqs., of counsel) for the plaintiff.

*Stuart E. Schiffer*, Acting Assistant Attorney General, *Joseph I. Liebman*, Attorney in Charge, Field Office for Customs Litigation, *Edmund F. Schmidt* and *Jerry P. Wiskin*, trial attorneys, Esqs., for the defendant.

NEWMAN, Judge: Plaintiff challenges the classification by customs of certain phototypesetting machines imported from West Germany in 1969, 1970, and 1971. The machines were classified as "Other [photographic] enlargers" and assessed with duty at the rate of 10 or 9 per centum ad valorem, depending upon the date of entry, under item 722.18, TSUS, as modified by T.D. 68–9.[1] Plaintiff claims that the imports are entitled to entry free of duty under the provision in item 668.25, TSUS, for typesetting machines.

I have concluded that plaintiff's claim should be sustained.

*Statutes Involved*

Tariff Schedules of the United States, 19 U.S.C. 1202:

*Classified under* [schedule 7, part 2, subpart F]:
Photographic cameras (other than motion-picture cameras), photographic enlargers, and combination camera-enlargers:

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 722.18 | Other enlargers and camera-enlargers------------------------ | [9%, 10% ad val. depending on date of entry] |

*Claimed under* [schedule 6, part 4, subpart D]:
*Part 4 headnotes:*
1. This part does not cover—

\* \* \* \* \* \* \*

---

[1] In one of the eight entries covered by this civil action, No. K–236030, customs classified the merchandise under the provision for cameras in item 722.16, TSUS.

> (v) articles and parts of articles spe-
> cifically provided for elsewhere in the
> schedules.

    \*      \*      \*      \*      \*      \*      \*

668.25      Linotype and typesetting machines, and
parts thereof _____      Free

### The Record

The record in this case comprises the testimony of two witnesses on behalf of plaintiff and one witness on behalf of defendant. Plaintiff's witnesses were Lawrence D. Klein, training manager for Berthold of North America, a subsidiary of H. Berthold, A.G. of Germany, manufacturer of the imported machines, and Kenneth Harlan Owen, products specialist for Berkey Marketing Cos. Defendant called Joseph D. Fielder, an instructor in graphic arts and related subjects at New York City Community College.

Each party submitted various exhibits.

The pertinent facts are:

In controversy are two machines sold under the names of "Staromat" and "Starsettograph." The Staromat and its less automatic counterpart, the Starsettograph, are phototypesetters designed to generate headline or display type, viz, type of one fourth inch in size or larger. Each machine has an upright bar affixed to the rear of a platform to which is attached a platen. The platen is in the shape of a shallow tray and is designed to hold sensitized paper or film bathed in developer fluid.[2] The platen can be swiveled, and can be moved from side to side and from front to back on geared rollers, according to markings calibrated in millimeters for precise settings.

Clamped to the upright bar is the head of the machine, containing a projection lamp, the light from which passes through a series of condenser lenses and mirrors to sharpen it, and then through a shutter mechanism containing a red filter. Below this point, the head of the machine contains a specially designed carrier with a slot on either side into which may be inserted a "font" 2 inches wide and 30 inches long,[3] consisting of a strip of acetate encased in clear plastic. The font contains upper- and lower-case alphabets, punctuation, numerals, and symbols. Below each letter on the font is a "foundry bar" (a bracket turned on its side) that aids the operator in proper spacing of the type.

In addition to using the foundry bars, proper spacing of the type characters is achieved by means of a millimetric ruler that is on the front of the machine, or by use of his eye the operator can place a letter any distance from the preceding letter. The font carrier has guides,

---

[2] In a photographic enlarger, the photosensitive paper or film is held by an easel.

[3] Owen testified that he had never seen photographic negatives or slides of this size used in a photographic enlarger.

pressure fingers, and rollers designed to hold the long strip font firmly under tension, and to allow the operator to move the font from side to side through the carrier by means of a crank to select the desired letters on the font. A lever automatically shifts the carrier forward or backward for setting upper- or lower-case letters. The carrier will accept only the fonts specifically made for it by the manufacturer of the machines, and thus will not accept photographic negatives or slides in the ordinary range of sizes. In this connection, plaintiff's witness Owen knew of no carriers in photographic enlargers that would accept the type font used with the instant machines and move it with precision from one letter to another (R.123).

Type is set or composed with the Staromat and Starsettograph in the following manner: The operator inserts the type font into the special carrier in the head of the machine. He then places a sheet of photosensitive paper or film on the platen, moistens it with an activating fluid, turns on the lamp (which remains on until the entire job is completed),[4] and shifts the font to select the first letter. An image of the first letter is projected through the red filter and appears on the sensitized typesetting paper or film, which is not sensitive to red light. Guided by this trial image, the operator raises or lowers the head to control the size of the letter being projected, and moves the platen by a lever to position the type image on the photosensitive paper in accordance with his design. For example, the platen is moved forward or backward to set one line of type over another in a headline comprised of two lines. Platen movement is calibrated in 1-millimeter increments, "so that positions can be gotten back to again, if you have to reproduce the job" (R. 51).

The letters on the font (exhibit 4) are five-sixteenths inch, and can be used without enlargement or reduction. To set larger or smaller type, the head of the machines must be raised or lowered. Thus, through enlargement or reduction of the characters on a single font, there is an infinite choice of type sizes available ranging from approximately $\frac{1}{32}$ to $5\frac{1}{2}$ inches.

So that the composed type will reproduce well in the various stages of printing, the machines adjust focus and exposure in relation to the size of the type being set, to obtain the sharpest and blackest image possible. The Staromat performs this function automatically by means of an electronic control box that is part of the machine as imported. The Starsettograph also performs this function, but not automatically.

When the type is correctly positioned and the operator triggers an exposure, the red filter automatically swings out of the way so that

---

[4] Unlike a photographic enlarger in which the light is turned off after each exposure, the light source for the instant machines remains on constantly once the machines are turned on, which is necessary for the proper positioning of the letters in setting type.

light projects through the font onto the photosensitive paper or film.[5] The light goes through only the letter or symbol on the font that is brought into position, which would be an area approximating three-eighths by one-half inch.

The imported machines are designed to utilize a patented photo-composing process (exhibit B), the essence of which is to permit the optical control of letter positioning during the photographic setting—"that is, the operator can visually watch the formation of a word through single letters, as in writing, and can regulate the positioning of the various letters" (exhibit B, col. 1, lines 16–18). The image of a letter begins to develop immediately on the phototypesetting paper or film because of the special activator fluid in the platen. By the time the operator has selected the next letter, the image of the first has blackened sufficiently so that it acts as a guide to position a red or safe trial image of the second type character on the paper in the desired relation to the first by shifting the platen. In order to correctly position the second letter, the operator must see where the first letter is located. The foregoing operation is repeated letter by letter and line by line on the same sheet of photosensitive paper, which remains in full view throughout. Hence, the operator of the machines is able to see the entire typesetting job as it progresses, which aids the composition and positioning of the type on the sheets of paper or film.

The paper or film on which type has been set is placed into a fixing bath to terminate its sensitivity. The life of the exposed paper is about 6 months to 1 year, as contrasted to paper used for black and white photographic enlargements, which will last about 50 years. A short life for the exposed phototypesetting paper is adequate since the product is usually pasted into a total composition with other materials, the whole page is then photographed, and the negative is used to make a printing plate.

Staromat and Starsettograph machines are designed for composing type used in headlines, advertisements, various printed forms, and catalogs. Plaintiff's witness Klein testified that from his knowledge of the list of buyers of the machines, none of the machines were sold to photographic enlargement houses (R. 71). Defendant's witness Fielder identified as typesetters several phototypesetting machines that operate similarly to a photographic enlarger or have enlargement capabilities (R. 159–62). Additionally, Fielder testified that the

---

[5] The red filter is connected to a solenoid spring, so that when exposure is triggered, the solenoid pulls the filter out of the path of the light, and when exposure is completed, the filter returns to position automatically covering the hole through which the light is transmitted. Owen had never seen an enlarger incorporating a red filter that automatically swings in and out of place (R. 120). However, he had seen red filters that had been attached to enlargers which could be moved manually that were at one time used in the place of a timer. but "they are somewhat vistigial organs of the past" (R. 120-21, 132).

Staromat "operates on the same principle as a photographic enlarger" (R. 148).

As shown on pages 4 and 5 of plaintiff's brochure (defendant's exhibit A), the imported machines can produce a wide range of typographic styles and special effects. Thus, typefaces can be set in condensed, extended, italicized, and backslanted styles. Typefaces can also be screened, reversed, shaded, drop-shadowed, or combined with tone. In addition to setting type in a straight line, type may be composed in a variety of circular, spiral, bounced, staggered, jumbled, step, and repeat or tight settings, and letters may be intentionally blurred, smeared, or distorted to create special effects.

### Summary of Parties' Contentions

Defendant contends that its classification of the imported machines under item 722.18, TSUS, is supported by the common meaning of the term "enlarger," and by legislative history. Moreover, defendant maintains that since the imports are specifically provided for as enlargers under item 722.18, these imports must in any event be excluded from classification as typesetting machines under item 668.25 by virtue of headnote 1(v), schedule 6, part 4, which excludes from part 4 articles specifically provided for elsewhere in the schedules.

Plaintiff argues that the imported machines have features that dedicate them for use in typesetting which are not embraced by the meaning of the term "enlarger" as used in item 722.18, but are encompassed by the provision for "typesetting machines" in item 668.25. Further, plaintiff contends that legislative history supports the classification of the imports as typesetting machines.

### Opinion

1

Resolution of the issue requires a determination of the meaning of the eo nomine provision for "enlargers" as this term is used in item 722.18, TSUS. Fundamentally, in the absence of a special commercial designation, the language of a tariff statute is to be construed in accordance with its common meaning. Further, the common meaning of the word "enlarger" is a matter of law to be determined by the court; and in making such determination, the court may rely upon its own understanding of the word or term used and may consult standard lexicographic and scientific authorities. The testimony of witnesses respecting common meaning is advisory only and has no binding effect on the court. *United States* v. *National Carloading Corp. et al.*, 48 CCPA 70, C.A.D. 767 (1961); *United States* v. *E. Besler & Company et al.*, 64 CCPA 121, 124, C.A.D. 1193, 557 F. 2d 270 (1977); *United States* v. *Corning Glass Works*, 66 CCPA 25, C.A.D. 1216, 586 F. 2d 822 (1978).

In support of its position that the imported machines fall within the common meaning of the term "enlarger," defendant cites:

LaCour and Lathrop, "Photo Technology" (1966), at page 113:

*Enlargers*

Basically all enlargers consist of a light source, a means of distributing the light evenly, a negative carrier, a lens, a focusing device, a means of changing the distance of the lens to a negative and an easel for holding the paper.

and

Webster's Third New International Dictionary (1963), at page 754:

One that enlarges, *specif.:* an optical projector used to produce a photographic enlargement.

Defendant maintains that the manner in which the imported devices operate coincides with the common meaning of the term "enlarger." Plaintiff, on the other hand, while conceding that the imported machines can enlarge (or reduce) the size of the font characters in the process of phototypesetting, vigorously argues that enlargement is only one aspect of the patented photocomposing process for which the machines were designed, and that the imports have additional features enabling the operator to select and compose type used in printing, which features distinguish the imports from photographic enlargers. In short, plaintiff contends that in the photocomposing of type the instant machines do not function simply as enlargers, but rather as typesetters. I agree.

The record amply supports the conclusion that the phototypesetting function performed by the Staromat and Starsettograph is more than photographic enlargement. The Government's classification of the machines as enlargers is thus predicated upon a single phase of the machines' typesetting function. In addition to their enlargement capability, the imports incorporate features for type selection and positioning that are not encompassed by the common meaning of the term "enlarger." Simply put, I find that the machines in issue are designed for photocomposing of type, and in performing that function they do more than simply enlarge.

As indicated supra, the photocomposing process performed by the machines in issue is covered by a patent (No. 3,196,016), introduced in evidence by defendant (exhibit B). That the essence of the patented process is not photographic enlargement, but rather the facilitation of letter positioning, is made abundantly clear from the following portion of the patent specification (exhibit B, col. 1, lines 14–18):[6]

* * * A *special advantage of the invention* (photocomposing process) is the optical control during the photographic setting—

---

[6] If the photocomposing process set forth in patent No. 3,196,016 (1965) was simply photographic enlargement, it is obvious that the patent would not have been issued in the light of the prior art in the photography field.

that is, the operator can visually watch the formation of a word through single letters, as in writing, and can *regulate the positioning of the various letters.* [Italic added.]

The patented photocomposing process utilized by the machines is further described in the portion of the descriptive pamphlet covering the Staromat introduced in evidence by defendant (exhibit A, p. 3):

* * * Special sensitized typesetting paper or film [7] is wetted in a special activator and is squeezed onto the print stage, or it is held on the stage with magnetic strips and the activator is applied with a hand applicator. The image is projected, distortion free, through a red filter that automatically swings out of place when the electronically controlled exposure is made by a foot switch. The image appears in black on the paper within seconds, as you simultaneously position the next letter through the red filter that returns to position in the light path. The operation is repeated letter by letter, and line by line on the same sheet of paper, which remains in full view throughout. *This ability to see the entire typesetting as you work, permitting easier composition and flexible positioning, is but one of the essential advantages of Staromat over other comparable phototypesetting equipment.* * * * [Italic added.]

The pamphlet further states that "The Starsettograph uses the same positive visual control system * * * as the Staromat" (exhibit 3).

Illustrating how a word is composed photographically under optical control, the specification of the patent reads (col. 2, lines 39–40): "The device used works *similar* to a photographic enlarger." [Italic added.] Significantly, the specification does not say that the device used "is" a photographic enlarger.

Although the imported machines are somewhat "similar" to enlargers, the common meaning of the term "enlarger" does not embrace the features incorporated in the imports that are designed to facilitate the selection and precise positioning of a series of continuously developing images (viz, type characters) according to the operator's design. As previously mentioned, these mechanisms include a font carrier for the selection of individual letters for exposure,[8] and a movable platen designed for the positioning of type. Also, as previously noted, the platen is tray-shaped so that the photosensitive paper or film can be moistened with developer fluid to permit the rapid positioning of a sequence of type characters, which is the key to the patented photocomposing process used by the instant machines. Consequently, each exposed letter immediately begins to develop,

---

[7] The patent specification states (col. 2, lines 22–25): "These materials are approximately 200 to 300 times less sensitive than normal paper for photographic enlarging, and are *generally used for contact printing only.*" [Italic added.]

[8] Defendant's exhibit A, p. 3, states: "With a single conveniently-placed, multi-purpose, hand-sized control knob, the operator simultaneously changes magnification *and advances the font from letter to letter. Anotherl ever automatically s hifts from upper to lower case letters, or visa versa.*[Italic added.]

and the operator can position the red-filtered image of the following letter in relation to it.[9] Unlike photographic enlargers, the Staromat and Starsettograph incorporate a red filter that operates automatically to allow the positioning of type by visual reference to type already set. Further, unlike the light source in an enlarger, which is turned on and off for each exposure, the light source in the instant machines remains lit while an entire series of letters is being set, not only to prevent the uneven exposure and delay that would result if the light were turned on and off after each letter was set, but to illuminate the position of each letter before exposure.

It is undisputed that the imported machines perform photographic enlargement. The machines' enlargement feature permits the setting of an infinite number of type sizes within a certain range using a single font, which contributes to the efficiency and economy of the photo-typesetting operation. Thus, specific sizes of type required for partic-ular printing jobs are available without the necessity for having on hand many different sizes of characters, which was required when typesetting was performed by the old system of using metal fonts.

To summarize, the record establishes that while the imported machines perform photographic enlargement, such feature is ancillary to their sole function as typesetting machines.[10] In view of the machines' special features for the selection and positioning of type under optical control, defendant's characterization of the imports as enlargers is plainly simplistic. The short of the matter is that as photo-typesetters, the imported machines represent something more than "enlargers" as such term is commonly defined, and consequently they are beyond the intended scope of item 722.18, TSUS. Cf. *E. Green & Son (New York), Inc.* v. *United States*, 59 CCPA 31, C.A.D. 1032, 450 F. 2d 1396 (1971); *United States* v. *Milton Diamond et al.*, 42 CCPA 9, C.A.D. 561 (1954).

2

In support of its classification of the imports as "enlargers," the Government urges the court to apply the well-established rule that an eo nomine designation of an article, without limitation or contrary legislative intent, judicial decision or administrative practice includes all forms of the article, *Nootka Packing Co. et al.* v. *United States*, 22 CCPA 464, T.D. 47464 (1935). In this connection, defendant posits that the imports are "nothing more than specialized enlargers" (brief, at 19), citing *Fairchild Camera & Instrument Corp. et al.* v.

---

[9] Plaintiff's witness Owen testified that he had never seen an easel of a photographic enlarger which was designed to hold a developer in a tray at the time of exposure; that he had never seen paper coated with a developer at the time of exposure used in a photographic enlarger; and that the operator of a photographic enlarger does not want the image to start appearing on the sensitized paper at the time of the exposure (R. 111-12).

[10] Defendant's witness Fielder conceded that various machines which set type photographically on sensi-tized paper or film and have enlarging capability are typesetting machines (R. 159-63).

*United States*, 53 CCPA 122, C.A.D. 887 (1966), and *United States* v. *Carl Zeiss, Inc.*, 27 CCPA 12, C.A.D. 54 (1939).

In *Fairchild Camera*, certain photofluorographic cameras, together with certain items of auxiliary equipment, were classified by the Government as photographic cameras under paragraph 1551 of the 1930 Tariff Act. There, plaintiff claimed that the imports were more than cameras, and that their proper classification was under the provision in paragraph 353 of the act covering electric X-ray apparatus, instruments, and devices. The Court of Customs and Patent Appeals found that the imports were special-purpose cameras designed solely for taking photofluorographic pictures in connection with an X-ray system known as photofluorography. In addition to their use for picture taking, it appeared that the imports were consistently described in sales literature as cameras, and the witnesses admitted that they were cameras. Citing the *Zeiss* case, our appellate court held that in classifying the imports as cameras it was unimportant that they were not adapted to general picture taking, but were special purpose cameras designed to photograph but one particular object.

In *Zeiss*, certain cameras used solely for purposes of photographing the retina of the eye for ophthalmological purposes, and which could not be used for any other purpose, were held to be classifiable as photographic cameras under paragraph 1551 of the 1930 Tariff Act, as claimed by the importer, rather than as testing or recording instruments for opthalmological purposes, as classified by the Government. The Court of Customs and Patent Appeals held that the mere fact the cameras were used exclusively to photograph a particular object for a special purpose did not change their status as photographic cameras.

*Fairchild Camera* and *Zeiss* are factually distinguishable from the present case. In both cases, the subject cameras, although intended for specialized uses, were designed solely for picture taking. Significantly too, in *Fairchild Camera* the merchandise was described in the sales literature as cameras, and the witnesses admitted that the articles were cameras. In sharp contrast, here the record shows that the Staromat and Starsettograph were not designed for the purpose of enlarging photographs, and that enlargement is but merely one phase of the machines' phototypesetting function. Moreover, the imported machines are not referred to in the sales literature as photographic enlargers, but rather as phototypesetters. In a word, the record establishes that the Staromat and Starsettograph are specialized phototypesetters rather than specialized enlargers.

## 3

We now consider defendant's contention that legislative history supports its classification of the imports as enlargers. On this aspect,

defendant points to the "Explanatory Notes to the Brussels Nomenclature." It must be recognized that the "Explanatory Notes" may properly be referred to as an aid to interpreting the provisions of the TSUS where there is a "close similarity in the wording" of the two provisions. *United States* v. *Abbey Rents*, 66 CCPA 2, n. 5, C.A.D. 1213, 585 F. 2d 501 (1978). Accordingly, it is appropriate to initially examine the language of the Brussels provisions relied upon by defendant. These provisions read:

> 84.34—MACHINERY, APPARATUS AND ACCESSORIES FOR TYPE-FOUNDING OR TYPE-SETTING; * * *

> \*     \*     \*     \*     \*     \*     \*

> 90.09—IMAGE PROJECTORS (OTHER THAN CINEMATOGRAPHIC PROJECTORS), PHOTOGRAPHIC (EXCEPT CINEMATOGRAPHIC) ENLARGERS AND REDUCERS.

It is immediately apparent that there is no "close similarity in the wording" of the Brussels provisions quoted above and TSUS items 668.25 and 722.18. However, inasmuch as both parties heavily rely upon the "Explanatory Notes to the Brussels Nomenclature" in support of their respective positions, further discussion of Brussels is warranted.

The "Explanatory Notes," volume III, pages 853–54, indicate that Brussels heading 84.34 excludes "photographic enlargers or reducers," but includes "phototypesetting and composing machines which actually set type even though the type is photographed after it has been set." With respect to the latter machines, the "Notes" go on to explain (at p. 854):

> * * * These machines operate, for example, by successively photographing characters mounted on revolving discs, or by photographing the face of special matrices. They either incorporate a keyboard or similar device, or are operated from paper bands previously perforated on a separate machine * * * .

Although the instant-display phototypesetters do not operate in the precise manner described above, they are nevertheless "phototypesetting and composing machines which actually set type even though the type is photographed after it has been set." I conclude, therefore, that the imports are within the purview of heading 84.34 of the Brussels nomenclature.

Defendant, however, insists that the Staromat and Starsettograph are "photographic enlargers and reducers of the type used in the preparation of printing plates and cylinders for the printing industry" within the ambit of Brussels heading 90.09 ("Explanatory Notes," vol. III, p. 1031), and that the machines fall within the following definition of photographic enlargers and reducers (ibid.):

> * * * These usually consist of a light source, a diffusing screen or a condensing lens, a negative holder, one or more ob-

jectives with a focusing device (often automatic), and an easel for supporting the sensitized paper; these parts are mounted on an adjustable vertical or horizontal support.

The type selection and positioning features, discussed supra, which exclude the instant machines from the common meaning of the term "enlarger," also exclude them from the above-quoted definition. To reiterate briefly, the imports operate similarly to photographic enlargers, but "in addition" possess the mechanisms for the rapid and precise positioning of type under optical control, which is the essence of the patented photocomposing process for which the machines were designed. Plainly, then, these additional features make the imports typesetting machines within the purview of Brussels heading 84.34, rather than photographic enlargers covered by item 90.09.

In summary, I do not find the nexus, asserted by defendant, between the Brussels and TSUS provisions predicated upon similarity of wording. Moreover, I find the TSUS provisions for typesetting machines and enlargers in items 668.25 and 722.18 to be clear and unambiguous, and consequently resort to legislative history is unnecessary and would be erroneous. *United States* v. *Corning Glass Works, supra; C. J. Tower & Sons* v. *United States*, 41 CCPA 195, C.A.D. 550 (1954); *Continental Manufacturing Co. et al.* v. *United States*, 82 Cust. Ct. 187, C.D. 4800 (1979). Indeed, assuming arguendo that resort to the Brussels nomenclature were necessary in this case, the "Explanatory Notes" support plaintiff's position.

4

It is well settled that in a classification case, the importer has a dual burden of proof: First, it must be shown that the Government's classification is erroneous; second, the importer must establish the correctness of its claimed classification. *Daisy-Heddon, Div. Victor Comptometer Corp.* v. *United States*, 66 CCPA 97, C.A.D. 1228, 600 F. 2d 799 (1979).

Having concluded that the imports are more than enlargers within the purview of item 722.18, TSUS, we now turn to assessing defendant's argument that plaintiff has failed to prove that the imports are classifiable as typesetting machines under item 668.25 because the machines have no keyboard.

In support of its argument that the provision for typesetting machines in item 668.25 is restricted to machines having keyboards, defendant cites *Lanston Industries, Inc.* v. *United States*, 49 CCPA 123, C.A.D. 807 (1962).

*Lanston* involved certain monophoto machines that were classified by the Government as photographic cameras under paragraph 1551, Tariff Act of 1930, and were claimed by the importer to be classifiable as typesetting machines under paragraph 1643, Tariff Act of 1930.

As in the case of the present devices, the monophoto machines set or composed type photographically. In determining whether the monophoto machines were classifiable as typesetting machines, our appellate court compared them with the older, well-known monotype typesetting machines, which utilized a hot-metal casting operation controlled by a keyboard-operated, tape-punching apparatus. Judge Rich, writing for a majority of the court, pointed out the similarities between the older monotype machines and the newer monophoto machines, and concluded that the monophoto machines were nothing more than a technical advance in typesetting which Congress must have foreseen. Further, Judge Rich admonished against trying "to search out nice differences between one kind (of typesetting machine) and another or exclude improvements" (49 CCPA at 128).

Although the court pointed out in *Lanston* that keyboard operation was one of the similarities between the monotype and monophoto machines, I do not read the court's opinion to hold that keyboard operation is a sine qua non of a typesetting machine. On the contrary, the ratio decidendi of *Lanston* is that technological advancements in the typesetting art will be judicially recognized in determining whether a particular device is classifiable as a typesetting machine, and that such classification is not restricted to machines that operate in a particular mode.

In the later case of *United States* v. *Consolidated International Equipment & Supply Co.*, 58 CCPA 145, C.A.D. 1018, 442 F. 2d 376 (1971), certain "multineg" or "step and repeat" machines that prepared printing plates by photocomposition, were held classifiable as typesetting machines under paragraph 1643, Tariff Act of 1930, following the rationale of *Lanston*, notwithstanding the fact that the multineg machines had no keyboard  The appellate court held in a per curiam opinion (58 CCPA at 146–47):

> We agree in particular with the findings of the Customs Court that the involved machines embody *a function* which bears an essential resemblance to and is a technological advancement over the basic process of lithography, and with its holding that the rationale of our decision in *Lanston Industries, Inc.* v. *United States*, 49 CCPA 123, C.A.D. 807 (1962) thus requires that these machines be treated for tariff purposes as coming under the eo nomine provision designed to cover machines which carry out that process. *The function of the lithographing process involves the setting of type by means of photocomposing on sensitized material.* Since lithography was in existence on the date of enactment of the 1930 act and clearly had to be included within the duty-free provision for "all typesetting machines" in paragraph 1643 of that act and since the involved machines "are used by the same trade, the same people, and for substantially the same purpose, *viz*, the production of printing plates," it follows that they should also be

entitled to classification under the provisions of that paragraph. [Italic added.]

The machines presently before us, like those in *Lanston* and *Consolidated International,* set or compose type by photographic means on sensitized material, and thus represent a technological advance in typesetting. Hence, the rationale of those cases is apposite here. Those cases teach that such technological advancements in typesetting as photocomposition are within the purview of the tariff provision for "typesetting machines." The fact that the Staromat and Starsettograph are special-purpose display phototypesetters without a keyboard and are suitable only for typesetting jobs involving a small amount of text, such as for a headline or advertisement, in contrast to the high-speed keyboard machines used for voluminous standarized text for newspapers or books, does not preclude classification of the imports under the eo nomine provision for typesetting machines, in accordance with their design and function. Cf. *United States v. Besler, supra* (special purpose cameras "held" not precluded from classification as cameras). Since I have determined that the merchandise in issue is a form of typesetting machine, I am persuaded this case is controlled by the well-established rule, mentioned supra, that an eo nomine designation without limitation includes all forms of the article. *United States v. National Carloading Corp., supra,* at 74.

The conclusion reached herein that, as phototypesetters, the imports are classifiable under item 668.25, TSUS, is also confirmed by the following statement in 8 "Summaries of Trade and Tariff Information" (1969), schedule 6, page 247–48: [11]

> There are several typesetting methods in common use; the more important ones are hand typesetting, Linotype and Intertype, Monotype, Ludlow, *phototypesetting,* computer typesetting, and cold typesetting.
>
> \*       \*       \*       \*       \*       \*       \*
>
> Phototypesetting represents modifications of the already existing methods, providing a fast, low-cost method of typesetting. In this method the melting pot and mold are replaced by a photographic unit. Newer types of phototypesetting systems are tape-controlled. The necessity of making proofs, required by metal linecasting machinery, is eliminated. The reproduction is generally of very high quality. Phototypesetting methods are used for business forms, book printing, and classified sections of newspapers. [Italic added.]

It may be noted that keyboard operation is not mentioned by the Tariff Commission (now International Trade Commission). Addition-

---

[11] The "Summaries of Trade and Tariff Information" have been frequently referred to as an aid in determining the scope of tariff provisions. See e.g.: *Pistorino & Co., Inc. v. United States,* 66 CCPA 95, C.A.D. 1227, 599 F. 2d 444 (1979); *American Bristle & Hair Drawing Co. et al. v. United States,* 59 CCPA 104, C.A.D. 1048, 458 F. 2d 524 (1972); *Tanross Supply Co., Inc. v. United States,* 58 CCPA 26, 31, C.A.D. 1000, 433 F. 2d 1332 (1970). See also *Lyons Export & Import, Inc. v. United States,* 59 CCPA 142, 144, C.A.D. 1056, 461 F. 2d 830 (1972); *The Englishtown Corporation v. United States,* 64 CCPA 84, C.A.D. 1187, 553 F. 2d 1258 (1977).

ally, it should be observed that defendant's witness Fielder defined a "typesetter" [12] as: "A device that generates characters that are eventually to be mass produced in a printing process" (R. 159). This definition also makes no mention of keyboard operation.

Finally, since there is nothing in item 668.25, TSUS, that limits the provision to machines with keyboards, defendant's restrictive interpretation is fundamentally at odds with the statute. Assuming arguendo that at the time the TSUS became effective (Aug. 31, 1963) phototypesetters were operated by means of a keyboard, it is inconceivable that Congress would have intended to foreclose from classification under item 668.25 future innovations in typesetting. Appropos is the following apt comment by Judge Rich in *Lanston* (49 CCPA at 128): "We are also mindful of the truism that tariff acts are written for the future."

Concluding, I find that the machines involved in this case are more than enlargers as classified by the Government, and that they are in fact and law, typesetting machines entitled to entry free of duty pursuant to item 668.25, TSUS. Judgment will be entered accordingly.

---

[12] The term "typesetter" is synonymous with "typesetting machine." See "The Random House Dictionary of the English Language" (unabridged ed. 1969), p. 1533.