MEDLINE INDUSTRIES, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Consolidated Court No. 92–11–00721

(Dated June 7, 1994)

*Hodes & Pilon (Lawrence R. Pilon),* for plaintiff.
*Frank W. Hunger,* Assistant Attorney General; *Joseph I. Liebman,* Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Nancy M. Frieden),* for defendant.

OPINION

GOLDBERG, *Judge:* This matter is before the court following trial *de novo.* Plaintiff, Medline Industries, Inc. ("Medline"), challenges the decision of the United States Customs Service ("Customs") to classify imports of the subject merchandise under subheading 6304.92.00 of the Harmonized Tariff Schedule of the United States ("HTSUS").[1] Medline contests Customs' denial of protest nos. 3901–91–100952; 3901–91–101046; 3901–91–101073; 3901–91–101228; 3901–92–100530; 3901–92–100573; 3901–92–100721; and 3901–92–100981 in this consolidated action. The underlying entries covered by these protests were entered for consumption at the port of Chicago between October 2, 1990 and January 15, 1992. Medline asserts that its merchandise is properly clas-

---

[1] At all times relevant to this action, subheading 6304.92.00, HTSUS, covered "Other furnishing articles, excluding those of heading 9404: Other: Not knitted or crocheted, of cotton," dutiable at the rate of 7.2 percent *ad valorem* and subject to textile quota restraints under textile quota category 369.

sified under subheading 6307.90.95, HTSUS.[2] The government claims, as its primary defense, that the subject imports are most properly classified under subheading 6302.31.20, HTSUS.[3] Alternatively, the government asserts that Customs' liquidation classification under subheading 6304.92.00, HTSUS, was correct. The court exercises its jurisdiction pursuant to 28 U.S.C. § 1581(a).

## BACKGROUND

Medline is a manufacturer, importer, and marketer of merchandise used by hospitals, nursing homes, and other similar health care providers. Medline does not manufacture, import, market, or sell goods designed or intended for use by the general public or in the home. The subject imports consist of rectangular pieces of fabric, of various sizes,[4] that have been hemmed on two or four sides, but are not otherwise formed; they do not have attached handles or other attachments. These pieces of fabric are too narrow and too short to fully cover a standard hospital or nursing home bed, or a patient in such a bed.[5]

The imported articles were described on all relevant commercial invoices as "lifters" and are referred to by Medline in this litigation as "lifters." Medline's catalogs refer to some of the imported articles as "lifters" and to others as "drawsheets." The government refers to the subject merchandise synonymously as "drawsheets" or "pullsheets." Medline sells the imported articles exclusively to hospitals and nursing homes; they are not sold by Medline to the general public, or to others who sell to the general public. Medline has identified its competitors as

---

[2] Subheading 6307.90.95, HTSUS (Supp. II 1990), covers "Other made up articles, including dress patterns: Other: Other: Other: Other," dutiable at the rate of 7.0 percent *ad valorem*, and not subject to any textile quota restraints. This provision was renumbered in subsequent editions of the HTSUS that are relevant to the instant action. Although renumbered, the scope of this provision remains unchanged. *Compare* subheading 6307.90.95, HTSUS (Supp. II 1990) *with* subheading 6307.90.94, HTSUS (1992) *and* subheading 6307.90.99, HTSUS (Supp. 1 1994). For purposes of discussion, the court will henceforth refer to this provision as subheading 6307.90.95; all other relevant numberings that are contained in various editions of the HTSUS are incorporated by reference.

[3] At all times relevant to this action, subheading 6302.31.20, HTSUS, covered "Bed linen, table linen, toilet linen and kitchen linen: Other bed linen: Of cotton: Other: Other: Other," dutiable at the rate of 7.6 percent *ad valorem* and subject to textile quota restraints under textile quota category 362.

[4] The imported articles bore the following Medline model numbers, with each model number reflective of the following sizes and polyester/cotton fiber content:

| Model no. | Size in inches width × length | Fiber content (percent) Polyester | Cotton |
|---|---|---|---|
| MDT 218761 | 54 × 90 | 45 | 55 |
| MDT 218762 | 54 × 72 | 45 | 55 |
| MDT 218763 | 54 × 81 | 45 | 55 |
| MDT 218902 | 54 × 72 | 45 | 55 |
| MDT 218903 | 54 × 81 | 45 | 55 |
| MDT 218904 | 54 × 90 | 45 | 55 |
| MDT 219112 | 45 × 72 | 45 | 55 |
| MDT 219113 | 45 × 81 | 45 | 55 |
| MDT 219120 | 51 × 81 | 40 | 60 |
| MDT 219125 | 51 × 72 | 0 | 100 |
| MDT 219127 | 51 × 81 | 0 | 100 |

*Pretrial Order,* Schedule C, Statement of Uncontested Facts ¶ 14.

[5] Standard hospital flat sheets used in the United States at all times relevant to the instant action were manufactured and sold in the following ranges of sizes: Width (66 inches to 72 inches); Length (104 inches to 115 inches). *Pretrial Order,* Schedule C, Statement of Uncontested Facts ¶ 17. The imported articles are thus narrower and shorter than standard hospital flat sheets, and require less material.

Standard Textile Co., Inc. ("Standard Textile"), and Baxter Healthcare Corporation.

## DISCUSSION

The government is afforded a statutory presumption of correctness in favor of Customs' liquidation classification; the burden of proving otherwise rests with the party challenging that classification. 28 U.S.C. § 2639(a)(1) (1988). The government's presumption of correctness attaches only to Customs' final classification decision, however, and does not extend to alternative claims made in defense. *Rollix Bearing, Inc. v. United States,* 15 CIT 11, 13, 757 F. Supp. 1412, 1414–15 (1991). Thus, in this case, the government bears the burden of proving the correctness of classification under Heading 6302, HTSUS. *See id.* Furthermore, as the government acknowledges, the *Explanatory Notes* to Heading 6304 indicate that this heading does not cover articles classifiable under Heading 6302.[6] By asserting classification of the subject imports under Heading 6302 as its primary defense, therefore, the government contradicts and rebuts the statutory presumption of correctness accorded to its decision to liquidate the merchandise under Heading 6304.

### A. TERMINOLOGY

As an initial matter, the court will first address the dispute between the parties over product terminology. Medline insists upon referring to its merchandise as "lifters." Based upon the testimony presented at trial, however, it appears that only Medline and its customers refer to the subject merchandise as lifters; the health care industry as a whole generally refers to such merchandise as drawsheets. While Medline is free to label its merchandise as it chooses, the court is persuaded that the subject imports are commonly known as drawsheets, and the court will refer to them as such.

The government made a substantial effort at trial to establish that the subject imports are not used for lifting, and that any attempt to lift a patient with a drawsheet would run counter to generally accepted health care practices. As the government's expert witness, Ms. Ellen Kurtz, testified, a drawsheet is primarily used to push, pull, slide, roll, or turn a patient in his or her bed. The drawsheet is placed under the patient so that it extends from the patient's head to below the buttocks. When used properly the drawsheet helps to maintain proper body alignment with adequate support, thereby avoiding undue strain on the patient's joints, muscles, tendons, or ligaments during positioning. Ms. Kurtz further testified that drawsheets are also used to assist in moving patients from bed to stretcher or stretcher to bed; to maintain bed linen; to provide patient comfort; to maximize cost effectiveness; to maintain asepsis; to adhere to universal precautions; to protect the patient's skin;

---

[6] 2 Customs Co-Operation Council, *Harmonized Commodity Description and Coding System: Explanatory Notes* 864–65 (1986) *("Explanatory Notes"); The Government's Pretrial Memorandum Of Law* at 6 n.2.

to assist in positioning the patient for physical therapy; and to protect smaller surfaces such as wheelchair seats and stationary chairs. In Ms. Kurtz's expert opinion, any attempt to lift a patient by means of a drawsheet would be hazardous to both patient and health care provider; specifically, a patient might fall while being lifted in this manner, and a health care provider faces the potential for back injury as a result of such a maneuver.

In response, Medline disavows any claim that drawsheets are used to lift people into the air; rather, it merely asserts that some lifting is involved in positioning a patient by means of a drawsheet. Mr. Roger Berndt, president of Medline's personal care division, testified that he understood Medline's use of the term "lift" to mean alleviation of the patient's weight during the course of positioning the patient, and not an actual upward movement of the patient into the air. It thus appears that by referring to its merchandise as lifters, Medline seeks to highlight the functional distinction between drawsheets and other types of sheets that are used as bed linen in the health care industry. The question presented, therefore, is whether drawsheets, i.e. a type of sheet primarily used to position patients in their beds, are classifiable as "other bed linen" under Heading 6302, or are instead properly classified as either "other furnishing articles" under Heading 6304, or "other made up articles" under Heading 6307, HTSUS.

## B. PROPER CLASSIFICATION

### 1. *Heading 6302, HTSUS:*

The government argues that as an *eo nomine* provision for bed linen, subheading 6302.31 encompasses sheets of all sizes, including drawsheets. It is well settled that in the absence of evidence to the contrary, a tariff term is to be construed according to its common and commercial meaning, which are presumed to be the same. *A & A Int'l. Inc. v. United States,* 11 CIT 775, 778, 676 F. Supp. 263, 265 (1987). In determining common meaning, the court may rely upon its own understanding of the term, as well as dictionaries, lexicons, scientific authorities, and other reliable sources. *Trans-Atlantic Co. v. United States,* 60 CCPA 100, 102, 471 F.2d 1397, 1398 (1973); *Simmon Omega, Inc. v. United States,* 83 Cust. Ct. 14, 20, C.D. 4815 (1979). In order to determine whether merchandise is described by a tariff term, the court considers, *inter alia,* the manner in which the merchandise is marketed, and the purpose for which it is intended to be used. *United States v. Quon Quon Co.,* 46 CCPA 70, 73, C.A.D. 699 (1959); *Hampco Apparel, Inc. v. United States,* 12 CIT 92, 95 (1988).

In this case, there has been no showing that the term "bed linen" possesses a commercial meaning unique to the health care industry.[7] The

---

[7] Indeed, the government's expert witness, Ms. Ellen Kurtz, testified that neither "bed linen" nor "furnishings" are terms specific to nursing or to the health care industry.

court first notes that *Webster's Third New international Dictionary* 196, 687, 2091 (1986), provides the following definitions:

> **bed linen** *n:* linen or cotton articles for a bed; *esp:* sheets and pillowcases[.]

> **drawsheet** *n:* a sheet drawn tight over a surface: as **a:** the outside or top sheet that holds the makeready on the platen or the impression cylinder of a printing press **b:** a narrow sheet used chiefly in hospitals and stretched across the bed lengthwise often over a rubber sheet underneath the patient's trunk[.]

> **sheet** \* \* \* **1a:** a piece of cloth (as a towel or napkin)—obs. except in specific applications **b:** winding-sheet **c:** an oblong of usu. linen or cotton cloth used in pairs as an article of bedding and placed one immediately under and one immediately over the person **d:** a piece of cloth used as a covering or wrapping (as for a horse); *esp:* dust cover \* \* \* **e:** sail **2:** a usu. oblong or square piece of paper \* \* \* **3a:** a broad stretch or surface of something that is usu. thin in comparison to its length and breadth or that presents a white, bright, or glistening surface \* \* \* **6:** all of a surface so connected that it is possible to pass from any one point of it to any other without leaving the surface—**between the sheets:** in bed[.]

*Defendant's Exhibit R* offers the following additional definition of the term drawsheet:

> **drawsheet (half sheet)** a special sheet, made of cotton, plastic, or rubber, that is placed across the center of the foundation of a bed[.][8]

The government asserts that the subject imports are "of the same class or kind of merchandise as merchandise known to the trade and to health care professionals as bed linen or sheets, and more specifically as 'drawsheets.'" *The Government's Pretrial Memorandum Of Law* at 5. The government would thus have the court conclude that because a drawsheet is a type of sheet used in a bed, it comes within the scope of the tariff term "bed linen." The court recognizes that at first glance the cited definitions provide apparent support for the government's position. Upon inspection, however, a more accurate alternative conclusion emerges. First, the term "bed linen" is broadly defined to include those items found on *all* beds; but, it is undisputed that drawsheets are utilized only by the health care industry, and even then, only for certain patients whose condition directs their use. It thus appears that drawsheets are outside the defined scope of the term "bed linen." Furthermore, the cited definition of the term "sheet" clearly states that when used as an article of bedding, a sheet is used in pairs. In contrast, the term "drawsheet" is defined as a *special* sheet which is used individually, not in pairs. The court thus considers the term "bed sheet" a reference to the fitted and flat sheets that are commonly used in conjunction to prepare a bed. The government's position simply ignores the significant

---

[8] Barbara Kozier & Glenora Erb, *Techniques in Clinical Nursing: A Nursing Process Approach* 992 (2d ed. 1987).

differences between drawsheets and bed sheets, differences which preclude classification of drawsheets as bed linen under the tariff schedule.

At trial, Medline introduced an exhibit which is indicative of the scope of the term "bed linen." Customs' Headquarters Ruling Letter ("HRL") 087522 was admitted into evidence as *Plaintiff's Exhibit 4.* This exhibit, dated October 2, 1990, provides a ruling on the classification of unfinished bedpads for the incontinent. HRL 087522 contains the following analysis:

> Heading 6302, HTSUSA, provides, inter alia, for bed linen. According to the Harmonized Commodity Coding and Description System, Explanatory Notes, which although not legally binding, constitute the official interpretation of the Harmonized System at the international level, bed linen includes such articles as sheets, pillow cases, bolster cases, eiderdown cases and mattress covers. While sheets, pillowcases, etc. are standard articles of bed linen, *bedpads are relatively uncommon, are marketed to nursing homes, institutions and hospitals. and are therefore distinguishable from the type of article classifiable in heading 6302.* Consequently, it is Customs' view that bedpads are a class of merchandise separate and distinct from articles of bed linen.
>
> *   *   *   *   *   *   *
>
> The article in question is classifiable in subheading 6307.90.9590, HTSUSA, under the provision for other made up articles, other, other, other, other, and is dutiable at the rate of 7 percent ad valorem.

*Plaintiff's Exhibit 4* at 1, 2 (emphasis added). The government vigorously argues that HRL 087522 should be ignored because the exhibit's analysis is allegedly unsound, and because a Customs Ruling Letter does not constitute controlling precedent in a trial de novo before this court. Clearly, HRL 087522 is not a controlling precedent. *See e.g., C.J. Tower & Sons v. United States,* 33 Cust. Ct. 14, 17, C.D. 1628 (1954). In the court's view, however, the reasoning employed by Customs in reaching the conclusion expressed in HRL 087522 is both valid and applicable to the present action.

Testifying on behalf of the government, Standard Textile's vice-president for marketing and sales, Mr. Norman Frankel, stated that approximately thirty-five percent of Standard Textile's current sales of bedding sets include a drawsheet. In contrast, at the time Mr. Frankel started his employment with Standard Textile in 1977, most if not all hospital beds included a drawsheet. In Mr. Frankel's view, such diminished usage is attributable to widespread substitution of drawsheets with reusable bed pads, also known as underpads, which have traditionally been used in caring for incontinent patients. Both Mr. Frankel and Mr. Berndt noted that underpads offer health care providers a cost effective means of employing one product for two distinct functions. Indeed, Mr. Frankel stated that reusable underpads are currently a primary tool for shifting and positioning patients in their beds. Mr. Frankel further testified

that, due to changing health care practices and alternative product development, this trend will only continue for the foreseeable future. It thus appears that drawsheets are an increasingly uncommon item in the health care industry.

With regard to the market for drawsheets, Mr. Berndt testified that all Medline products, including drawsheets, are sold exclusively to hospitals, nursing homes, or wholesale distributors; no Medline products are sold to the general public, or to distributors who sell to the general public. Mr. Frankel agreed that retail establishments do not sell drawsheets. In contrast, the bed sheets and pillow cases commonly associated with the term "bed linen" are routinely sold by retail outlets. Although Medline's customers frequently purchase drawsheets in conjunction with bed linen, there are times when these products are purchased separately. Moreover, even when purchased together, there is no guarantee that the drawsheet will be used in conjunction with the other items to prepare a patient's bed; a drawsheet is employed only when the needs of a particular patient so necessitate. Thus, based upon the testimony presented at trial, the court finds that drawsheet usage has decreased substantially, and that drawsheets are marketed solely to hospitals, nursing establishments, wholesale distributors, and other health care institutions; in contrast to bed sheets and pillow cases, drawsheets are not marketed to the general public via retail establishments.

There are additional distinctions between drawsheets and bed sheets that merit discussion. First, the court notes that while bed sheets and pillow cases are commonly constructed from muslin and percale fabrics, woven drawsheets are constructed from muslin, percale, broadcloth, and, in particular, sateen fabrics.[9] Indeed, the heavier sateen fabric used by Medline to construct so-called "lifters" is unsuitable for use in a bed sheet or pillow case. Second, the court notes the very obvious difference in size between drawsheets and other bed sheets. In this regard, the court finds most telling the fact that, if necessary, a bed sheet may be used as a drawsheet (i.e. by first folding the bed sheet in half), but that due to a drawsheet's smaller size, it is impossible to employ a drawsheet as a bed sheet. The government argues that Heading 6302, HTSUS, does not specify a threshold size requirement, and that therefore classification of drawsheets as bed linen is not precluded. The government further notes that "[s]heets intended for cribs or youth beds are no less sheets even though their dimensions are smaller than those intended for adults. Even for adults, sheets are produced in varying sizes in accordance with the size of the bed on which they will be used, *i.e.*, single, double, queen or king." *The Government's Pretrial Memorandum Of Law* at 8. The government fails to acknowledge, however, that regard-

---

[9] Drawsheet construction is dependent upon customer preference; for instance, a sateen drawsheet is heavier than other types of drawsheets and therefore provides more strength for positioning a patient in bed, and is better able to sustain repeated laundering. Because the material used is heavier, however, a sateen drawsheet is more expensive than other types of drawsheets on a cost-per-use basis due to fewer possible units per wash and a relatively longer drying time.

less of its size, a sheet is a bed sheet only if it is capable of functioning as such, i.e. by completely covering and tucking underneath the mattress with which it is intended to be used. Thus, a drawsheet is not a bed sheet because a drawsheet is incapable of being used as a bed sheet.[10] Heading 6302 understandably omits a size specification because the term bed linen embraces any sheet capable of functioning as a bed sheet, regardless of its size. Because drawsheets are too small to be used as bed sheets to prepare a patient's bed, they are functionally distinct from those sheets that are commonly understood to be bed linen.

In sum, upon comparing drawsheets with bed sheets, the court finds, based upon dictionary definitions; substantially diminished usage; and differences in market channels, component materials, size, and function, that drawsheets are outside the scope of what is commonly referred to as bed linen. Classification under Heading 6302, HTSUS, is therefore unwarranted.

### 2. *Heading 6304, HTSUS:*

As noted earlier, by proffering Heading 6302, HTSUS, as its primary defense, the government has rebutted the presumption of correctness that attached to Customs' liquidation classification in this case. The court will therefore evaluate Customs' decision solely on the basis of the evidence presented at trial, and upon the court's reading of this tariff provision. *See Jarvis Clark Co. v. United States,* 2 Fed. Cir. (T) 70, 75, 733 F.2d 873, 878 (1984).

The government justifies its decision to classify the subject imports under Heading 6304 because this provision more specifically provides for functional furnishing articles, in contrast to the "basket" provision claimed by Medline, i.e. subheading 6307.90.95. Before reaching this issue of relative specificity, however, the government must first establish that drawsheets are in fact classifiable under Heading 6304. This it has failed to do. The *Explanatory Notes* to Heading 6304 provide:

> This heading covers furnishing articles of textile materials, **other than** those of the preceding headings or of **heading 94.04,** for use in the home, public buildings, theatres, churches, etc., and similar articles used in ships, railway carriages, aircraft, trailer caravans, motor-cars, etc.
>
> These articles include wall hangings and textile furnishings for ceremonies (e.g., weddings or funerals); mosquito nets; bedspreads (but **not including** bed coverings of **heading 94.04);** cushion covers, loose covers for furniture, antimacassars; table covers **(other than** those having the characteristics of floor coverings * * * mantlepiece runners; curtain loops; valances **(other than** those of **heading 63.03).**

[10] Drawsheets are intended to be used in the beds of patients who are incapable of positioning themselves. Although it is conceivable that, due to its size, a percale or muslin drawsheet could be used as an ordinary bed sheet for an atypical mattress such as that used in an infant's crib, there has been no showing that drawsheets are ever put to such use. Moreover, in light of the other factors discussed, this hypothetical possibility is an insufficient basis for concluding that a drawsheet is bed linen.

The government argues that drawsheets are a type of covering, and are thus generally akin to the articles listed in the *Explanatory Notes* to Heading 6304; in particular, the government argues that drawsheets are similar to bedspreads. The court disagrees.

First, although a drawsheet literally covers a bed, this is clearly not a drawsheet's intended use. The primary role of a drawsheet is to aid health care provider(s) when positioning a patient in bed, not to protect or embellish the article which it covers. Drawsheets are thus functionally distinct from the coverings listed in the *Explanatory Notes* to Heading 6304. Furthermore, as with bed sheets, a comparison to bedspreads fails to recognize the specialized nature of drawsheets. While bedspreads are common to most if not all beds, drawsheets function only in specific applications in the field of health care. The court thus finds that drawsheets are not included within Heading 6304. Because drawsheets are not more specifically provided for by other headings of Section XI of the HTSUS, the court concludes that the subject imports are properly classified under Heading 6307, HTSUS.

### CONCLUSION

Based upon the foregoing analysis, the court finds that Customs incorrectly classified the subject merchandise under subheading 6304.92.00, HTSUS. Furthermore, a drawsheet, while literally a sheet used kon a bed, is a special type of sheet such that it is outside the scope of what is commonly understood to be bed linen; classification of drawsheets under subheading 6302.31.20, HTSUS, is therefore inappropriate. The court concludes that the imported articles are properly classified under subheading 6307.90.95, HTSUS, as "Other made up articles, including dress pattermns: Other: Other: Other: Other." Judgement will be entered accordingly.